[Cite as *State v. Kuck*, 2016-Ohio-8512.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**DARKE COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2015-CA-13 |
| | : | |
| v. | : | Trial Court Case No. 14-CR-233 |
| | : | |
| KLINT P. KUCK | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 29th day of December, 2016.

. . . . . . . . . . .

R. KELLY ORMSBY, III, Atty. Reg. No. 0020615, Darke County Prosecutor's Office, Darke County Courthouse, 504 South Broadway, Greenville, Ohio 45331
    Attorney for Plaintiff-Appellee


DWIGHT D. BRANNON, Atty. Reg. No. 0021657, KEVIN A. BOWMAN, Atty. Reg. No. 0068223, DOUGLAS D. BRANNON, Atty. Reg. No. 0076603, and MATTHEW C. SCHULTZ, Atty. Reg. No. 0080142, Brannon & Associates, 130 West Second Street, Suite 900, Dayton, Ohio 45402
    Attorneys for Defendant-Appellant

. . . . . . . . . . . .

HALL, J.

{¶ 1} Klint Kuck appeals his convictions for rape, sexual battery, and selling or

furnishing beer or intoxicating liquor to an underage person. Finding no error, we affirm.

## I. Background

{¶ 2} Kuck was indicted on five charges for offenses against two 19-year-old women. Kuck owned the Backroads Bar in New Madison, Ohio. "Sara"[1] visited the bar one Friday night in July 2012. The State alleged that Kuck gave Sara alcohol (violating R.C. 4301.69(A), selling or furnishing beer or intoxicating liquor to an underage person) and then raped her behind the bar (violating R.C. 2907.02(A)(1)(c), sexual conduct when the other person's ability to resist or consent is substantially impaired). Seven months later, in February 2013, "Jane"[2] visited the bar on a Friday night. The State alleged that Kuck gave her alcohol too (again violating R.C. 4301.69(A)) and that he brought her to his home (kidnapping her under R.C. 2905.01(A)(2)) where he raped her (again violating R.C. 2907.02(A)(1)(c)). The offenses against both women were jointly tried to a jury. At trial, the State first presented the evidence supporting the offenses against Sara and then presented the evidence supporting the offenses against Jane. When the State rested, Kuck presented his defense. Following Kuck's evidence, the State presented two rebuttal witnesses.

*Sara*

{¶ 3} Sara testified that on Friday, July 13, 2012, she went to her girlfriend's house for a pool party, where each had a couple of Bud Lights. While Sara was there, the girlfriend called her husband only to hear a woman answer the phone, which upset her. The girlfriend then convinced a reluctant Sara to go with her to the Backroads Bar. The

---

[1] We use this pseudonym to refer to the first victim.

[2] We use this pseudonym to refer to the second victim.

girlfriend used to work there and wanted to see some of the people she used to work with.

{¶ 4} Sara drove them to the bar in her car, and they arrived around 10:30 or 11:00 p.m. There the girlfriend introduced Sara to Kuck, whom Sara had never met before. According to Sara, neither Kuck nor anyone else at the bar ever asked how old she was. Sara had not planned on drinking, but she was pressured into it. Soon after arriving she downed two shots and half a can of Bud Light, all of which Kuck had brought to her. After the second shot, she felt very tired, so Sara went out to her car and fell asleep. The girlfriend later found and woke her. The two went back into the bar, and Kuck handed Sara another shot, which she drank. Afterwards, said Sara, "something didn't feel right and I was really tired still and I remember looking across the clock in the bar and then it felt like my knees were about to collapse." (Tr. 212).

{¶ 5} Sara noticed that she had received a text message, but she could not respond because her phone was dead. So she left the bar to go recharge the phone in her car. But Sara could not remember getting there. The next thing she knew, Kuck was knocking on the car window, or opening the car door. She tried to stand up but blacked out. The next time she woke, Kuck was holding her up against the outside wall of the bar, and Sara felt his penis in her vagina. Sara yelled out, and Kuck took off running. Sara's legs would not support her weight, and she passed out on top of the nearby air-conditioning unit. Around 4:00 a.m. Sara's girlfriend tried to get her husband to come and pick them up, but he refused. So Kuck gave them a ride home. Sara remembered only waking for about two seconds in the back of Kuck's truck and seeing her girlfriend and him talking.

{¶ 6} Sara woke up later Saturday morning in her girlfriend's home. She told her girlfriend what had happened. When she got to her own home, Sara put the clothes that she had worn to the bar into a grocery bag and threw the bag into a closet. She took a "morning after pill" that day and went to see her doctor (actually, a physician's assistant) the following Monday. Sara tearfully described to the doctor what had happened. The doctor performed STD tests. She also encouraged Sara to report the matter at the hospital and to get Sara counseling. But Sara did not report the incident, because she did not feel strong enough at the time. When she returned to college in Indiana, where she was a student, she saw both a psychologist and a psychiatrist. Eventually, it all became too difficult for Sara to deal with, so she withdrew from school.

{¶ 7} Six months or so later, Sara heard that Kuck had been accused of raping Jane. Sara communicated with her, and Jane encouraged her to come forward and contact the police. After hearing about Jane and having had months of therapy, Sara was ready to talk to the police. She spoke first with the New Madison Police Department and later with the Darke County Sheriff's Office. Sara gave police the clothes that she had worn that night, which were still in the bag in her closet. DNA analysis found Kuck's DNA on her underwear and shorts. Sara was adamant that she never agreed to have sex with Kuck that night or led him to believe that she wanted to have sex with him. Testified Sara: "I absolutely did not consent" "[b]ecause I've never, and nor will I ever, sleep with a stranger ever." (Tr. 281).

{¶ 8} Sara's girlfriend's testimony agrees with Sara's as to the events leading up to their visit to the bar. After they arrived, the girlfriend thought Sara got a beer to drink.

She testified that she thought she told Kuck that Sara was underage, but her testimony is not clear on this point. After a while, said the girlfriend, she could not find Sara inside, so she went out to the car, where she found her. She testified that Sara "was acting different and funny," that she was "[j]ust out of it. Just sleepy somehow or just—it's not who I walked in with after drinking one beer. She was totally different." (*Id.* at 343).

{¶ 9} Sara's girlfriend said that they went back inside and that she again lost track of Sara. This time she found Sara outside lying on the air-conditioning unit. The girlfriend testified that she then had a time of memory loss herself that night, saying that she had never had the experience where she was "that messed up where I'm totally not knowing from 11:30 to 4:00 what happened." (*Id.* at 359). The girlfriend said that Kuck took her and Sara home. Later that morning, at her home, the girlfriend said that Sara told her about what happened with Kuck. On Sunday, Kuck called Sara's girlfriend "to see if we [the girlfriend and Sara] were all okay." (*Id.* at 348). Sara's girlfriend thought that this was odd because other times that she had been out drinking he never called to check on her.

*Kuck's defense*

{¶ 10} Kuck took the stand to testify in his own defense. He testified that Sara's girlfriend told him that Sara was 21 years old. Kuck admitted that he was already drunk when the two arrived. He said that Sara did not seem drunk when she arrived but appeared to get drunk while at the bar. Around 1 a.m., Sara asked Kuck and one of his friends if they wanted to go outside for a cigarette. Kuck agreed, though he does not smoke, and they went out behind the bar. After 10 or 15 minutes, said Kuck, he and Sara started kissing. According to Kuck, one thing lead to another and she performed oral sex

on him for a couple of minutes. Then Sara turned around and lowered her pants so that they could have intercourse. But Kuck "got off" before they could do that. (Tr. 735). Afterwards, Kuck went back into the bar alone and Sara followed five minutes later, because, said Kuck, she did not want her girlfriend to see them walk in together.

{¶ 11} Kuck said that he and Sara talked and drank until 2:30 a.m., closing time, when Sara and her girlfriend left. When Kuck left to go home around 3:15 a.m., he found them still outside because Sara had locked her keys in her car. Sara was sleeping on the air-conditioning unit behind the bar. After Sara's girlfriend and Kuck chatted for a bit, the girlfriend called her husband to come pick them up. He refused, so Kuck took them home. He picked up Sara and put her in his truck and then drove them to the girlfriend's house and dropped them off.

{¶ 12} Kuck also presented the testimony of Tim Painter, Cody Harris, and his mother, Diana Kuck. Painter testified that he thought that he was at the bar the night that Sara was there and that he went outside at one point and saw Kuck and Sara kissing behind the bar. Painter said that he was "pretty intoxicated," having twenty drinks by the end of the night. And he admitted that he did not know Sara. It was later that he came to believe that she was who he saw kissing Kuck that night. Harris testified that he had been friends with the Kuck family for years. He said that he was at the Backroads Bar when Sara came in on the night in question. Harris said that that night he went outside, behind the bar, and saw two silhouettes, one crouched in front of the other. About thirty seconds later, he saw Sara and Kuck come into the light. Harris said he was only at the bar that night for about a half hour. Diana Kuck testified that she managed the bar for her son. She said that they did not permit or condone underage drinking at the bar and that their

policy was to check identification for proof of age. Said Diana, "we tried everything that we could possibly do to see that it did not happen." (Tr. 698). She said that she was at the bar the night Sara was there. Diana said that she saw a beer in Sara's hand and that she thought Sara looked young. So she asked Sara her age, and Sara said that she was twenty-one. Diana said that Sara's girlfriend also told her that Sara was twenty-one. Diana further claimed that she checked with the bartender to make sure that she had verified that Sara was twenty-one, and the bartender said that she had. Diana said that Sara asked Kuck to go outside and smoke with her and that Sara and her girlfriend left with all the other customers at closing time, around 2:30 a.m. Diana said that she and Kuck left around 3:15 a.m.

### Rebuttal

{¶ 13} The State called Monique Isaacs as a rebuttal witness. Isaacs testified that she had worked at the Backroads Bar for Kuck as a bartender and that she was working on the night that Sara came in. Isaacs said that she remembered being told that it was okay to serve Sara and remembered seeing Sara drinking with Kuck. Kuck, said Isaacs, would come to the bar to pick up drinks to take back to the table for himself and Sara. Isaacs also said that Sara was tired and that Kuck carried her outside around closing time.

{¶ 14} Kuck's mother had testified that Isaacs worked briefly at the bar and was let go for drinking on the job and closing early.

### Jane

{¶ 15} Jane testified that she lived in Richmond, Indiana, but that she had grown up in New Madison and had friends in the area. She said that on Friday, February 22,

2013, she had two shots before leaving her home around 11:00 p.m. She went with friends to a bar in Greenville, Ohio, called The Triangle, where Jane had three shots. She and her friends left The Triangle between midnight and 12:30 a.m. and arrived at Kuck's bar around 1:30 a.m. Jane had never been to the bar before, and though she had heard of Kuck and knew that he was the owner, she had never met him before. Soon after arriving, Jane met him. She said that she told Kuck that she was only 19 years old and that he told her that she was too young to drink. But Kuck later changed his mind, Jane said, and brought her a shot. Over the next hour, she testified, Kuck brought her five to ten shots, all of which she consumed.

{¶ 16} Jane did not plan to stay long at the bar, because her friends, whom she had been riding with were eager to leave. But Kuck told her that he could take her home. Jane "was confident" that he would take her home safely. (Tr. 409). And if he did not, she had other friends there that she believed would get her back home. So Jane stayed, and her friends left. The last thing that she remembered from the bar was looking at a digital clock and seeing that it read 2:19 a.m. She remembered everything up until that time. After that things were "just black." (*Id.* at 410).

{¶ 17} The next thing that Jane remembered was waking up later that Saturday morning around 10:00 a.m. She was lying naked on the floor with a towel over her. At first, she did not know where she was. Then she saw Kuck and another man. She heard something from them like: " 'We got to go. We got to get her out of here.' " (*Id.* at 415). She got dressed and the other man drove her home. She felt ill and vomited at least once on the way home, where she arrived around 10:30 a.m.

{¶ 18} Some of Jane's friends were at her apartment when she got home, and she

told them what she could remember. Her friends noticed scrapes and bruises all over her body—on her face, arms, buttock, and knee—none of which were present when they left her at the bar. Jane was having her period at the time. She could not find the tampon that she had put in, so she put another one in. Her friends took her to the hospital in Greenville that morning to get a rape kit done. The nurse who examined Jane at the hospital found the missing tampon wedged deep inside her. Afterwards, Jane went to the police and told them what had happened to her. Jane testified that she was not attracted to Kuck or interested in him socially. And she said that she would never have consented to sex during her period with a tampon still inside her.

{¶ 19} The State also presented the testimony of several of Jane's friends or acquaintances who were present at the bar, and of the nurse who examined her at the hospital. One of Jane's friends testified that she had driven with Jane from Jane's home to The Triangle and then to the Backroads Bar. This witness said that she left the bar early, after Jane said that Kuck would bring Jane home. The witness said when Jane got home, she had several injuries on her body that were not there when she last saw Jane at the bar. Another witness testified that he was at the bar when Jane came in. He said that she spent a little time with him and his friends but spent most of her time with Kuck. This witness also said that Kuck escorted him and his friends out of the bar a little before the normal closing time, around 2:20 a.m., he guessed. He said that at that time he thought Jane was intoxicated. He finally said that Jane called him the next day "panicked," (Tr. 508), and "upset," (*id.* at 509), trying to find out what had happened at the end of the night. Another acquaintance testified that he saw Jane at The Triangle and then at the Backroads Bar. He said that he saw Jane drinking drinks that Kuck gave her. He believed

that Jane was "definitely under the influence," "loud" and "unsteady on her feet." (*Id.* at 534). He remembered Kuck closing the bar a little early, while Jane was still sitting at the bar. Finally, the SANE (sexual assault) nurse who collected the rape kit at the hospital, testified that she photographed injuries on Jane's body, including scratches on the left side of her jaw, bruises on both of her arms and both of her legs, abrasions and bruises on her knee, scratches on her back, and a scratch on the back of her thigh. The nurse said that Jane was "very upset, very anxious." (*Id.* at 580).

*Kuck's defense*

**{¶ 20}** Kuck testified that not long after Jane walked into the bar, she approached him and started up a conversation. She told him that she knew where he lived and that he had a hot tub. She told him that she was only 19 years old, and he told her that she could not drink. He could tell that she had been drinking already, and she told him that she had come from The Triangle. Kuck was already drunk by then. Jane was all over him that night, said Kuck, and most of the time she was "standing right between [his] legs." (Tr. 750). When her friends wanted to leave, Jane did not want to, so she asked Kuck if he would give her a ride home. After her friends left, Jane repeatedly told Kuck that she wanted to go to his house "to go hot tubbing." (*Id.* at 748). Kuck said that he closed the bar a little early that night, kicking out the few remaining patrons at 2:25 a.m.

**{¶ 21}** Kuck let the bartender close, and he drove Jane, and his friend Mitch Engle, to his house. When they entered the house, Kuck went to his bedroom to get swim shorts for everyone. Jane stripped out of her clothes and walked into Kuck's bedroom naked. They had intercourse. Afterwards, Kuck passed out. When Kuck woke up, he found Jane laying on the living-room floor covered with a towel and Engle sleeping on the couch.

Kuck asked Engle to give her a ride home, which he did.

{¶ 22} Kuck also presented the testimony of Rick VanWinkle, Cody Harris, and Kuck's brother Klayton Kuck. VanWinkle testified that he had visited the Backroads Bar sometime in February of 2013 and saw a young lady there sitting with Kuck whose name he did not recall. VanWinkle brought some drinks over, and Kuck told him that she was only twenty years old, so she could not have the drink. VanWinkle said that Kuck, the young lady, and Mitch Engle left around 1:30 a.m. Harris testified that he was at the bar when Jane came in and that she was already under the influence. He said that he saw Jane kissing Kuck in the bar and thought she was trouble. Harris said that Jane did not drink. Kuck's brother Klayton testified that he believed that he was there on the night that Jane came in to the Backroads Bar. He said that he and Kuck had quite a few drinks and that Kuck was drunk. About Jane, he said, "She was either drunk or on something when she showed up [at the bar]. You know, you can pinpoint the drunkest girl in the bar or whether someone's on something at that point." (Tr. 643). Klayton said that he did not see Jane drinking.

*Rebuttal*

{¶ 23} The evidence concluded with the State's second rebuttal witness, Ben Willetts. Willetts testified that he had worked as a bartender for Kuck at the Backroads Bar in 2009 and 2010, before the incidents involving Sara and Jane. Willetts said while he worked there, Kuck changed the bar's policy to allow anyone age sixteen and up in the bar. Willetts said that Kuck did not appear to have a problem occasionally serving underage people, especially girls, like a girlfriend or a friend's girlfriend or sister. Willetts said that if Kuck was getting the drinks, young ladies did not usually have to pay.

{¶ 24} Kuck's mother had testified that Willetts was let go for stealing from the bar. Willetts denied stealing and explained why she thought that he had.

*The verdicts*

{¶ 25} The jury found Kuck guilty of selling or furnishing beer or intoxicating liquor to Sara, under R.C. 4301.69(A), and of raping her, under R.C. 2907.02(A)(1)(c). As to the offenses against Jane, the jury found Kuck guilty of selling or furnishing beer or intoxicating liquor to her too, under R.C. 4301.69(A). And it found him guilty of sexual battery under R.C. 2907.03(A)(2), a lesser included of rape under R.C. 2907.02(A)(1)(c). But the jury found him not guilty of kidnapping. The trial court sentenced Kuck to jail for a total of seven years.

{¶ 26} Kuck appealed.

## II. Analysis

{¶ 27} Kuck presents six assignments of error. We consider the last three assignments of error first and then turn to the first three.

### A. Prosecutorial misconduct

{¶ 28} In the fourth assignment of error, Kuck argues that the jury's guilty findings are the result of prosecutorial misconduct.

When reviewing a claim of prosecutorial misconduct, "[t]he relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct.

1868, 40 L.Ed.2d 431 (1974). To answer that question, we consider whether the conduct was improper and whether it prejudicially affected the defendant's substantial rights. In evaluating prejudice, we determine the effect of the misconduct "on the jury in the context of the entire trial." *State v. Keenan*, 66 Ohio St.3d 402, 410, 613 N.E.2d 203 (1993).

(Citation omitted.) *State v. McKelton*, Ohio Sup.Ct. Slip Opinion No. 2016-Ohio-5735, ¶ 257. "If a defendant failed to object to the alleged misconduct below, however, we review the claim for plain error. To prevail on plain-error review, [the defendant] must establish both that misconduct occurred and that but for the misconduct, the outcome of the trial clearly would have been otherwise." (Citations omitted.) *State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 111.

### 1. *Evidentiary claims*

**{¶ 29}** Several of Kuck's arguments here are, in essence, evidentiary claims. "Accordingly, we must determine whether each piece of challenged evidence was properly admitted." *Id.* at ¶ 114. "A trial court enjoys broad discretion in admitting evidence," so "[t]his court will not reject an exercise of this discretion unless it clearly has been abused and the criminal defendant thereby has suffered material prejudice." *State v. Long*, 53 Ohio St.2d 91, 98, 372 N.E.2d 804 (1978). "If the evidence was properly admitted, then the prosecutor's decision to offer it cannot form the basis of a misconduct claim." *Mammone* at ¶ 116.

**{¶ 30}** Appellant complains that Sara testified about her involvement with a church, her relationship with her fiancée, her enrollment in college and whether she received counseling all in violation of the rape shield statute and Evid. R. 404(A). The rape-shield

statute, R.C. 2907.02, excludes only evidence of "specific instances," "opinion evidence," and "reputation evidence" of the victim's or the defendant's sexual activity. R.C. 2907.02(D). None of Sara's testimony in this regard has anything to do with evidence of sexual activity as prohibited by the statute, so the rape shield statute simply does not apply. Kuck also argues that the testimony is improper character evidence. Evid.R. 404(A) excludes "[e]vidence of a person's character or a trait of character * * * for the purpose of proving action in conformity therewith on a particular occasion." Sara's testimony has little bearing on any particular character trait. Her testimony about involvement in a church group was relevant to explain how she came to know her fiancée who was a team leader of the group, not as evidence of her character. The fiancée offered relevant testimony that Sara texted him several times the night of the rape and her later texts were not making sense. He also testified about her demeanor the next day and that she convinced him to obtain a "morning after pill" for her. This was not character evidence. Likewise, her enrollment in college and involvement in counselling had nothing to do with character evidence.[3] Ultimately, we see no plain error in the testimony's admission.

---

[3] We note that a reasonable argument could be made that evidence of victim impact, such as the participation in counselling and withdrawal from college, is inadmissible and was prejudicial under Evid. R. 403. *See, e.g., State v. Presley,* 10th Dist. Franklin No. 02AP–1354, 2003–Ohio–6069, ¶ 85-86. However the Eight District has held that a victim of sexual assault may testify about the lingering trauma that results. *See, e.g., State v. Eads*, 8th Dist. Cuyahoga No. 87636, 2007-Ohio-539, ¶ 59. We have held that trial counsel is not ineffective for failing to object to evidence about a rape victim's behavioral changes at school and home following the rape. *State v. Seymour*, 2d Dist. Montgomery No. 14324, 1994 WL 660763, *7 (Nov. 23, 1994). Other states allow rape victim impact evidence. *See, e.g., Dickerson v. Commonwealth*, 174 S.W.3d 451, 466–467 (Ky.2005), ¶ 21 (concluding that evidence that rape victim went to a rape trauma center for treatment was relevant to prove she was sexually assaulted, and citing holdings of seven other jurisdictions which allow evidence of emotional impact). We need not resolve this potential argument because it was not raised, preserved, or argued and we find no plain error in the admission of the evidence.

**{¶ 31}** Ben Willetts, the former bartender, testified that "there was the time he [Kuck] was dating a younger girl and that was one that he wanted me to serve." (Tr. 856). Kuck argues that this testimony concerns his sexual history and violates the rape-shield statute. This testimony has little to do with Kuck's sexual activity, so the rape-shield statute does not apply. Kuck further alleges (but does not argue) that Willetts's testimony is inadmissible character evidence under Evid.R. 404(A). Even assuming that it is character evidence, an exception to Evid.R. 404(A) allows "[e]vidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same." Evid.R. 404(A)(1). The State called Willetts as a rebuttal witness specifically to rebut Kuck's testimony that he did not serve underage people.[4] We see no plain error.

2. *Comments about Kuck's lifestyle and his treatment of women*

**{¶ 32}** Kuck alleges (again, without argument) that the prosecutor engaged in misconduct by focusing the prosecution on his lifestyle, painting him as a bad person and undermining his credibility. And Kuck argues that the prosecutor engaged in misconduct when, during closing arguments, the prosecutor accused him of treating women as "piece[s] of meat" and of not intending to call Jane after they had sex. Kuck did not object to the prosecutor's comments, so we review only for plain error.

**{¶ 33}** During the State's closing argument, the prosecutor told the jury:

> This is a situation where these two young women meant absolutely nothing to him. I don't know if he knew [Sara's] name or [Jane's] name the day after all this stuff happened. I think just even in listening to his own

---

4   The trial court had ruled earlier in the trial that the State could call Willetts if Kuck so testified. (Tr. 598).

testimony, which I'm not sure he appreciates, he kind of represents some of the worst stereotypes that you hear about guys. That they look at women as just a piece of meat, somebody that if you can get sex from them great. If they're conscious and willing, that's fine. If they're not so much conscious or willing, that's okay too. However you manage to get your sex from some woman, I think as far as Klint Kuck is concerned, is fine. He's just looking for, you know, another notch in the belt.

In this case, I don't think it mattered if these girls were too drunk or too sick or some combination of the two. That wasn't going to deter him. He made that clear that he really didn't care. You know, if he gets lucky, that's all that he's looking for. Whatever sexual enjoyment he gets out of it is fine. And if he is getting lucky on the first night that he meets some young lady at the bar, he's sure never going to call them back. He told us that. You know, he wasn't interested in whether he got anybody's phone number or not. He wasn't going to pursue a relationship because if they were the type of girl he could get sex from out of at his bar on the first night, he said he wasn't going to call them back. They weren't somebody he was interested in.

You know, there's always the next weekend. There's always the next crop of young girls that are coming in next Friday or Saturday, and he has the perfect hunting ground. He's got his own bar. He described it as every guy's dream, you know. I don't know how true that is. You can look at that yourselves. Is it every guy's dream to own their own bar and they can drink

and control and, I don't know, do whatever they want to do at their own bar?

(Tr. 866-867).

**{¶ 34}** Kuck says that the prosecutor's comments that he treated women as "a piece of meat" and was looking for "another notch in the belt" were blatant appeals to the jury's emotions. Kuck also says that the prosecutor improperly expressed his own opinion that Kuck was not only guilty but also a bad person because he would have sex with women and not call them afterward.

**{¶ 35}** "Prosecutors are granted wide latitude in closing argument, and the effect of any conduct of the prosecutor during closing argument must be considered in light of the entire case to determine whether the accused was denied a fair trial." (Citation omitted.) *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 149. The prosecutor's statements are mild compared to statements that the Ohio Supreme Court has allowed describing other defendants. *See, e.g., State v. White*, 82 Ohio St.3d 16, 22, 693 N.E.2d 772 (1998) (calling the defendant a coward); *State v. Brown*, 38 Ohio St.3d 305, 316-317, 528 N.E.2d 523 (1988) (calling the defendant a monster); *State v. Beuke*, 38 Ohio St.3d 29, 33, 526 N.E.2d 274 (1988) (referring to the defendant as a cancer requiring removal). We do not think that the statements are plainly outside acceptable latitude.

### 3. *Leading questions*

**{¶ 36}** Kuck says that the State asked Sara, Sara's girlfriend, and Jane leading questions. He cites this question to Sara: "I guess I just want to ask you, has anything remotely like this happened to you before? I mean, where you just lost a lot of time and don't remember what happened exactly? I mean, specifically regarding some kind of

situation where you had sex with somebody. Have you ever had that happen— and had no recollection of what happened?" (Tr. 280-281). When asking Sara's girlfriend about Sara's condition when they left the Backroads Bar, the prosecutor asked: "So, I guess, could you describe a little better what her condition was. Was it just tired?" (*Id.* at 344). The girlfriend responded that Sara was "out of it." The prosecutor then asked, "Okay. I mean, had you seen her consume enough alcohol that you thought she was drunk from alcohol?" (*Id.*). The prosecutor asked Jane, "Do you remember how you met him [Kuck]? I mean, did you just see him at the bar? Did he come to you? Did you go to him? Do you remember anything about that?" (*Id.* at 398). Shortly after, the prosecutor asked her, "Is there some point in the evening where you don't really remember anything after a certain time?," (*id.* at 410), and then asked, "So after you've actually went to the bathroom, couldn't find your tampon, put the other one in, did you say—did you get in the bathtub or something?," (*id.* at 420).

{¶ 37} "A leading question is 'one that suggests to the witness the answer desired by the examiner.' " *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 149, citing 1 McCormick, Evidence (5th Ed.1999) 19, Section 6. We do not necessarily find the questions appellant has quoted to be leading. To the extent that they may arguably be leading, "it is within the trial court's discretion to allow leading questions on direct examination." (Citations omitted.) *State v. Jackson*, 92 Ohio St.3d 436, 449, 751 N.E.2d 946 (2001). And Kuck did not object to any of these questions. We do not see any plain error.

### 4. *Hearsay*

{¶ 38} Kuck says that "salacious" hearsay in Sara's girlfriend's testimony was

erroneously admitted. The girlfriend testified that while Kuck was closing the bar, she heard someone say, " 'She has hair down there.' " (Tr. 345). This comment was spontaneously stated by the witness when the inquiry was about what she remembered happening around closing time. Kuck did not object. Assuming that this is inadmissible hearsay, we see no plain error in its admission.

{¶ 39} The fourth assignment of error is overruled.

## B. Multiple errors by the trial court

{¶ 40} In the fifth assignment of error, Kuck alleges that the jury's guilty findings are the result of multiple errors made by the trial court.

### 1. *Refusing to sever offenses*

{¶ 41} Kuck argues that the trial court erred by overruling his motion to sever the offenses against Sara from the offenses against Jane. He says that the joinder prejudiced him by implying that he had a habit of engaging in sex with younger women.

{¶ 42} Ohio "law favors joining multiple offenses in a single trial under Crim.R. 8(A) if the offenses charged 'are of the same or similar character.' " *State v. Lott*, 51 Ohio St.3d 160, 163, 555 N.E.2d 293 (1990), quoting Crim.R. 8(A). But a defendant is entitled to severance under Crim.R. 14 if he can show prejudice. *Id.* "Even then, the state can overcome a defendant's claim of prejudicial joinder by showing either that (1) it could have introduced evidence of either of the offenses, if they had been severed for trial, as 'other acts' under Evid.R. 404(B) or (2) the 'evidence of each crime joined at trial is simple and direct.' " *McKelton*, 2016-Ohio-5735, at ¶ 299, quoting *id.* There are common threads in the two events: underage drinking and intoxication at Kuck's bar with claims that he took advantage of both women. Evidence of one may be admissible in the other when it goes

to show "motive, opportunity [or] intent." Evid. R. 404(B).

{¶ 43} Assuming that Kuck showed prejudice from the joinder of the offenses, that prejudice was negated by the simple and direct nature of the evidence. The State first presented evidence of the offenses against Sara and then presented evidence of the offenses against Jane. The evidence could be easily segregated, making it unlikely that the jury would have confused the evidence proving the separate offenses. *Compare State v. Echols*, 8th Dist. Cuyahoga No. 102504, 2015-Ohio-5138 (concluding that the evidence of rape and kidnapping offenses against separate victims that occurred five years apart was simple and direct). The court did not abuse its discretion by refusing to sever the offenses for trial.

### 2. *Jury instructions*

{¶ 44} Kuck next argues that the trial court gave improper jury instructions about the substantial-impairment elements of rape and sexual battery. Kuck did not object to the instructions, so we review only for plain error.

{¶ 45} The court gave these instructions about substantial impairment:

Substantial impairment is established by demonstrating a present reduction, diminution or decrease in the victim's ability either to apprise the nature of his conduct or to control his or her conduct. Whether a person is substantially impaired does not have to be proven by expert medical testimony; rather, it can be shown to exist by the testimony of people who have interacted with the victim and by allowing the jury to do its own assessment of the person's ability to apprise or control one's own conduct. The determination of substantial impairment is made on a case-by-case

basis depending on the facts determined at trial.

Voluntary intoxication constitutes a mental or physical condition that can cause substantial impairment. The consumption of large amounts of alcohol in a short period of time *is evidence* that voluntarily intoxication caused substantial impairment. Evidence of substantial impairment can also come from a victim's inability to remember the events of the incident due to alcohol consumption. Stumbling, falling, slurred speech, passing out and vomiting are all evidence that an intoxicated person *is substantially impaired.*

(Emphasis added.) (Tr. 912). Kuck argues that the instructions in the second paragraph create a mandatory presumption that shifts the burden of proof from the State on an essential element of the offenses of rape and sexual battery. He says that these instructions had the effect of placing undue stress on the issue of substantial impairment, and made it appear that the issue was already decided. Kuck argues that by saying that something "*is* evidence"—as opposed to "*may be* evidence"—suggests that the jury must find substantial impairment if it finds that the person consumed large amounts of alcohol. Similarly, he argues that using the phrase "is substantially impaired" suggests that if the jury finds that the person stumbled, fell, had slurred speech, passed out, or vomited, it must find that the person was substantially impaired.

{¶ 46} Only the first sentence in the above-quoted paragraphs comes from the *Ohio Jury Instructions. See* CR 507.02(A)(1). The second paragraph comes from the Third District's opinion in *State v. Lasenby*, 3d Dist. Allen No. 1-13-36, 2014-Ohio-1878. While not a standard instruction, it is a correct statement of the law. We have said that

"the consumption of a large amount of alcohol over the course of just a few hours is sufficient evidence to warrant allowing a jury to consider whether [a woman] was substantially impaired." *State v. Hatten*, 186 Ohio App.3d 286, 2010-Ohio-499, 927 N.E.2d 632, ¶ 22 (2d Dist.). And we have said that "stumbling, falling, slurred speech, passing out, or vomiting" are aspects of behavior that are evidence of substantial impairment. *Id.* at ¶ 24.

{¶ 47} We do not think that the second paragraph creates any mandatory presumptions. An instruction creates a mandatory presumption if it, "both alone and in the context of the overall charge, could have been understood by reasonable jurors to require them to find the presumed fact if the State proves certain predicate facts." *Carella v. California*, 491 U.S. 263, 265, 109 S.Ct. 2419, 105 L.Ed.2d 218 (1989). In contrast, "[a] permissive inference suggests to the jury a possible conclusion to be drawn if the State proves predicate facts, but does not require the jury to draw that conclusion." *Francis v. Franklin*, 471 U.S. 307, 314, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985). The instructions here do not tell the jury that if it finds that one of the victims consumed a large amount of alcohol in a short time, it must presume that the victim was substantially impaired. Similarly, the instruction does not tell the jury that if it finds that one of the victims was stumbling, falling, slurring her speech, passing out, or vomiting, it must presume that she was substantially impaired. Rather, the instruction says that these facts are simply evidence of substantial impairment. We see no plain error.

### 3. *Allowing dismissal and re-indictment*

{¶ 48} The State first indicted Kuck on January 24, 2014. At the State's request, the indictment was dismissed without prejudice on May 14, 2014. The State then re-

indicted Kuck on September 29, on the same counts. And Kuck was brought to trial on April 27, 2015. Kuck argues that the trial court erred by allowing the State to dismiss the original indictment and then file another indictment containing the same charges. Once again, Kuck did not object, so we review only for plain error.

{¶ 49} By statute, a person charged with a felony must be "brought to trial within two hundred seventy days after the person's arrest." R.C. 2945.71(C)(2). The Ohio Supreme Court has held that "for purposes of computing how much time has run against the state under the speedy-trial statute, the time period between the dismissal without prejudice of an original indictment and the filing of a subsequent indictment, premised upon the same facts as alleged in the original indictment, shall not be counted unless the defendant is held in jail or released on bail pursuant to Crim.R. 12(I)." *State v. Broughton*, 62 Ohio St.3d 253, 259-260, 581 N.E.2d 541 (1991). But "any time period that has elapsed under the original indictment should be tacked on to the time period commencing with the second indictment." (Citation omitted.) *Id.* at 261.

{¶ 50} Here, there are 111 days between the original indictment and the dismissal. Between the dismissal and the re-indictment, Kuck was not held in jail or released on bail under Crim.R. 12(I), so that period does not count. From the re-indictment to the trial is 209 days. So Kuck was brought to trial 320 days after his arrest—well beyond the 270-day limit. But the limit may be extended by "[a]ny period of delay necessitated by reason of a * * * motion, proceeding, or action made or instituted by the accused" or by "[t]he period of any continuance granted on the accused's own motion, and the period of any reasonable continuance granted other than upon the accused's own motion." R.C. 2945.72(E). Here the trial was originally scheduled to begin on February 2, 2015, within

the 270-day period, but Kuck moved for a continuance due to a discovery issue. At the same time, we note, Kuck signed a waiver of the 270-day period.

{¶ 51} Kuck does not actually claim that his speedy-trial rights were violated—only that the trial court should not have permitted the dismissal and re-indictment. We see no problems—certainly not anything approaching plain error.

#### 4. *Refusal to dismiss a prospective juror*

{¶ 52} Kuck argues that the trial court erred by not dismissing a prospective juror for cause. "A trial court has broad discretion in determining a prospective juror's ability to be impartial." *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 94. And "[a] trial court's ruling on a challenge for cause will not be disturbed on appeal absent an abuse of discretion." *Id.*

{¶ 53} R.C. 2313.17 provides that "good cause exists for the removal of a prospective juror when 'he discloses by his answers that he cannot be a fair and impartial juror or will not follow the law as given to him by the court.' " *Id.*, quoting R.C. 2313.17(B)(9). "In deciding whether to exclude a juror for cause, the court must determine whether the prospective juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *White*, 82 Ohio St.3d at 20, 693 N.E.2d 772, quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980).

{¶ 54} Here, during voir dire a prospective juror told the trial court that she did not think that she "would be able to judge properly" because her son, who had died fifteen years before, was raped when he was young. (Tr. 137). The trial court then asked her several questions:

The court: "I don't know how difficult it is for that experience nor do I want to know but whether or not you can separate out your own circumstances and then decide this case listening to both sides." (*Id.* at 138).

Prospective Juror: "Well, I think I can." (*Id.*).

The court: "Setting aside your own circumstances is what every juror is expected to do." (*Id.*).

Prospective Juror: "Right." (*Id.*).

The court: "So you're not allowed to insert difference (sic) names or different personalities or different circumstances and go back and decide what should have happened years ago. You have to decide these facts and this case with this jury. Understand that there's a separation?" (*Id.* at 138-139).

Prospective Juror: "Right, right. Yeah, yeah." (*Id.* at 139).

The court: "Are you a pretty independent person?" (*Id.*).

Prospective Juror: "I guess so." (*Id.*).

The court: "Are you able to make your own decisions?" (*Id.*).

Prospective Juror: "Yeah. Sure." (*Id.*).

The court: "There's 12 people in a jury. When the jury has to hear the evidence and go back and argue what they believe it means and talk about the facts, does that sound like the kind of thing you do? Listen to other people, make up your own mind, discuss back and forth." (*Id.* at 140).

Prospective Juror: "Yes." (*Id.*).

The court: "It's disagree. It's hear each other's opinions. It's formulate your own discussion after listening to other people." (*Id.*).

Prospective Juror: "Exactly." (*Id.*).

The court: "Able to do that?" (*Id.*).

Prospective Juror: "Sure." (*Id.*).

The court: "With this subject matter, can you do that?" (*Id.*).

Prospective Juror: "I'm not sure. I'll be honest with you. I'm not sure."

The court: "That's fair." (*Id.*).

The court: "Nobody else here is able to say with a hundred percent certainty that's the case also." (*Id.*).

The court: "To the best of their thinking right now, they're all saying, okay, I believe I can do this. It's only Monday. The hard part of the trial, there's always a hard part, it's always what's coming next." (*Id.* at 141).

The court: "Because you don't know what's coming next so it's the unknown. At some point in time it really was and sometimes it's not. But you're not fearful or hesitant about trying this, are you?" (*Id.*).

Prospective Juror: "No, I'm not." (*Id.*).

Defense counsel also asked some questions:

Defense counsel: "Now, do you feel that you could be a fair and impartial juror at this point?" (Tr. 153).

Prospective Juror: "No, I do not." (*Id.*).

Defense counsel: "And are you pretty confident in that position that you don't feel—I mean, whether it's one side or the other, I guess what I'm

asking you is, can you say without question that you could be fair and impartial to both sides at this point?" (*Id.* at 154).

Prospective Juror: "I don't think I could be fair." (*Id.*).

Defense counsel moved to dismiss the prospective juror for cause, the trial court overruled the motion, and counsel exercised a peremptory challenge.

**{¶ 55}** The courts in two analogous cases concluded that the respective trial courts did not abuse their discretion by overruling motions to excuse for cause. A prospective juror in *State v. White* expressed concern over whether she could be impartial, repeatedly stating that she was not sure that she could be fair. On being questioned by the trial court, the prospective juror acknowledged that she was a fair person and was willing to listen to all the evidence before making a final decision. She also stated that she would not let her personal feelings interfere with her ability to be fair and would obey the law and the trial court's instructions. The Ohio Supreme Court concluded that the trial court did not abuse its discretion by overruling the defendant's challenge for cause, noting that the challenged juror ultimately said that she would follow the law and put aside her personal beliefs. Like the potential juror in *White*, a potential juror in *State v. Hillenbrand*, 8th Dist. Cuyahoga No. 67153, 1995 WL 277075 (May 11, 1995), said during voir dire that she did not know if she could be impartial. The appellate court said that the transcript showed that the prospective juror was open and honest about her experience. And the court noted that the transcript established that the prospective juror understood and appreciated the right to a fair trial and the presumption of innocence. The appellate court concluded that the defendant failed to demonstrate that the trial court abused its discretion by not dismissing the juror for cause.

{¶ 56} Here, the trial court implicitly found, based on the prospective juror's answers, that despite her assertion to the contrary, she could be a fair and impartial juror. While the prospective juror believed that she would not be able to judge properly, the trial court, through its questions, was able to show that she would do her duty properly. We think that this conclusion is reasonable.

5. *Failing to direct a verdict on the kidnapping offense*

{¶ 57} Kuck argues that the trial court should have directed a verdict on the kidnapping offense. A court may, on motion of a defendant or on its own motion, enter a judgment of acquittal of an offense "if the evidence is insufficient to sustain a conviction of such offense." Crim.R. 29(A). Kuck did not move for a directed verdict on this offense, so the plain-error standard of review applies.

{¶ 58} Although Kuck was found not guilty of kidnapping Jane, he argues that he was still prejudiced by the trial court not directing a verdict on the offense. The prejudice, Kuck says, is based on venue. The indictment alleges that he took Jane from the bar, which is in Darke County, to his home, which is in Preble County, where the rape occurred. The case was brought in Darke County. Kuck says that without the kidnapping offense venue would not be proper in Darke County for the rape offense. Indeed, the next portion of Kuck's argument under this assignment of error argues that the rape offense against Jane should have been dismissed for this reason.

{¶ 59} "Trial courts have broad discretion to determine the facts that would establish venue. Venue need not be proven in express terms; it may be established either directly or indirectly by all the facts and circumstances of the case." (Citations omitted.) *State v. Jackson*, 141 Ohio St.3d 171, 2014-Ohio-3707, 23 N.E.3d 1023, ¶ 144. Venue

for an offense is generally proper "in the territory of which the offense or any element of the offense was committed." R.C. 2901.12(A). But if an offender "as part of a course of criminal conduct, commits offenses in different jurisdictions, the offender may be tried for all of those offenses in any jurisdiction in which one of those offenses or any element of one of those offenses occurred." R.C. 2901.12(H).

{¶ 60} Here, in addition to kidnapping and rape, Kuck was charged with selling or furnishing beer or intoxicating liquor to an underage person. While the rape may have occurred in Preble County, Kuck allegedly gave Jane alcohol earlier in Darke County. The trial court could have found that these offenses were "part of a course of criminal conduct." So it is doubtful that the absence of the kidnapping offense would have resulted in the trial court ruling that venue for the rape offense is improper in Darke County. We see no plain error.

## 6. *Failing to dismiss rape charge*

{¶ 61} Kuck argues in the next portion of his argument under this assignment of error that without the kidnapping offense, venue is not proper in Darke County for the rape offense against Jane. Because we find no plain error as to the kidnapping offense, Kuck's argument here fails.

## 7. *Sexual battery as a lesser-included offense of rape*

{¶ 62} Finally, Kuck argues that the trial court erred by instructing the jury that sexual battery is a lesser included offense of rape. Kuck did not object to the instructions, so the plain-error standard of review applies.

{¶ 63} The Ohio Supreme Court's lesser-included-offense test is this:

An offense may be a lesser included offense of another if (i) the offense carries a lesser penalty than the other; (ii) the greater offense cannot, as statutorily defined, ever be committed without the lesser offense, as statutorily defined, also being committed; and (iii) some element of the greater offense is not required to prove the commission of the lesser offense.

*State v. Deem*, 40 Ohio St.3d 205, 533 N.E.2d 294 (1988), paragraph three of the syllabus. Kuck argues that sexual battery under R.C. 2907.03(A)(2) cannot be a lesser included offense of rape under R.C. 2907.02(A)(1)(c) because rape does not have an additional element that is missing from sexual battery.

**{¶ 64}** The Eleventh, Tenth, and Eighth Districts have all concluded that sexual battery under R.C. 2907.03(A)(2) is a lesser included offense of rape under R.C. 2907.02(A)(1)(c). But the courts differ on what rape's additional element is. The Eleventh District has found that "rape imposes the additional element that the offender not only knew, but also had reasonable cause to know of the impairment." *In re Sechler*, 11th Dist. Trumbull No. 96-T-5575, 1997 WL 585928, *6 (Aug. 29, 1997). The Tenth District has found that the additional element for rape is "proof that the victim's substantial impairment is due to a mental or physical condition or because of advanced age." *State v. Stricker*, 10th Dist. Franklin No. 03AP-746, 2004-Ohio-3557, ¶ 33. And the Eighth District has found that rape's additional element is "that the victim could not resist or consent to the offender's acts." *State v. Felton*, 8th Dist. Cuyahoga No. 92295, 2010-Ohio-4105, ¶ 35.

**{¶ 65}** We note too that the Seventh District has concluded that sexual battery under R.C. 2907.03(A)(2) is a lesser included offense of rape under a different section,

R.C. 2907.02(A)(1)(*a*), giving the victim any drug, intoxicant, or controlled substance to induce the substantial impairment. *State v. Eberth*, 7th Dist. Mahoning No. 07-MA-196, 2008-Ohio-6596, ¶ 26. The court found that, "[w]hile the rape offense involved in *Stricker* included the additional element of the victim's mental or physical condition or advanced age, the rape offense involved here deals with the additional element of offender[-]induced substantial impairment." *Id.* at ¶ 21. The difference between section (A)(1)(c) and (A)(1)(a) did not matter to the court's analysis: "What is key is that both offenses involved 'substantial impairment,' regardless of how it is induced." *Id.*

{¶ 66} Kuck argues that there is no functional difference between the impairment of the ability to appraise the nature of, or control one's own conduct and the impairment of one's ability to consent to or resist sexual conduct. But this argument does not address whether rape requires proof of an additional element. Given that at least four other districts have concluded, based on solid reasoning, that there is an additional element, we see no plain error.

{¶ 67} The fifth assignment of error is overruled.

### C. Juror questions

{¶ 68} In the sixth assignment of error, Kuck argues that the trial court failed to follow certain procedures in allowing jurors to question the witnesses. Kuck did not object at trial, so we review only for plain error.

{¶ 69} Crim.R. 24(J) provides procedures that a court must use if it permits jurors to question a witness. One of the procedures states that "[b]efore reading a question to a witness, [the court must] provide counsel with an opportunity to object to each question on the record and outside the hearing of the jury." Crim.R. 24(J)(4). Another procedure

states that the court must "[r]etain a copy of each proposed question for the record." Crim.R. 24(J)(2). Here, Kuck points out that the trial court reviewed proposed juror questions with counsel but did so off the record. This means that there is no record of any objections that were made, the discussion had, and the court's rulings. Kuck also says there is no indication in the record that the questions were collected and retained. Therefore, says Kuck, there can be no appellate review.

{¶ 70} Juror questions were put to four witnesses—Monique Isaacs, Kuck, Rick VanWinkle, and Sara. Kuck is correct that the discussion of the questions was held off the record. But according to the transcript, Kuck objected to only two questions, one to Isaacs and one to VanWinkle.[5] The objection to Isaacs' question was overruled. The ruling on VanWinkle's question isn't clear from the transcript. Kuck does not point to any of the questions directed to Isaacs or VanWinkle as being a problem. Nor does Kuck argue how, but for those questions, the outcome would have been different.

{¶ 71} While the trial court should have reviewed its rulings about the questions on the record, we find no plain error. Isaacs and VanWinkle are minor witnesses. And the answers that they gave to the juror's questions are not such that the jury's verdicts would have been any different without either one of them.

{¶ 72} The sixth assignment of error is overruled.

{¶ 73} We turn now to the first three assignments of error, which we consider in order.

---

[5] As to questions to Kuck, the trial court noted, "No objections. One not asked by agreement." (Tr. 781). And to Sara's questions defense counsel told the court: "I don't know if some of these are relevant but I don't really have an objection to this. I'm not sure it's an appropriate question. I'm good with these three." (Tr. 284).

### D. Ineffective assistance of counsel

**{¶ 74}** In the first assignment of error, Kuck argues that counsel provided constitutionally ineffective assistance. "Reversal of a conviction for ineffective assistance of counsel requires that the defendant show first that counsel's performance was deficient and second that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial." *State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, ¶ 74, citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). We "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland* at 689.

#### 1. *Failing to move for acquittal*

**{¶ 75}** Kuck first argues that trial counsel was ineffective for not moving for acquittal on the rape offenses on the grounds that the State failed to present any evidence that Kuck knew that either Sara or Jane was "substantially impaired." But the failure to move for acquittal under Crim.R. 29 does not rise to the level of ineffective assistance of counsel if the motion would have been futile. *State v. Faulkner*, 2d Dist. Clark No. 2892, 1993 WL 125452 (Apr. 22, 1993). Here, we conclude in our review of the second assignment of error that the evidence is sufficient to find that Kuck knew Sara and Jane were substantially impaired. So a motion for acquittal would have been futile.

#### 2. *Failing to obtain transcripts of witness interviews*

**{¶ 76}** Kuck next argues that trial counsel was ineffective for not obtaining transcripts of Sara's or Jane's interviews with police. Kuck says that this prevented counsel from successfully impeaching either victim. Without transcriptions, says Kuck, trial counsel failed to show the jury that Sara was changing her testimony and that Jane's

accusations were motivated by financial gain.

{¶ 77} Sara testified that she put all the clothes that she was wearing on the night of her encounter with Kuck in a plastic grocery bag, tied up the bag, and put it in a closet. When she went to the police, she gave them the clothes for examination. During his cross-examination of Sara, trial counsel asked her about statements that she made during her interview with a detective about the clothes:

Q. And when you were talking to the detective, he made the comment to you, "If there is male DNA on the clothing," and your response was, "There is".

A. Yes.

Q. Do you remember telling him that "I marked on it. There's semen around my underwear"?

A. No. I did not say that.

Q. So if this detective would testify that you, in fact, told him that "I marked on it, there's semen around my underwear," that would be untrue?

A. That's untrue because I never stated that.

Q. Do you remember him asking you if Klint ever[] ejaculated and you said I don't know[?]

A. Yeah. I said I don't know.

(Tr. 276-277). At this point, the trial court interrupted to voice its concern that without something to show what Sara actually said "the jury won't know if you're making up the question or if it's, in fact, the detective's statement or his recitation." (*Id.* at 278). Counsel told the court that there was an audio recording but no transcript. Counsel explained that

he was "going to wait to see if the detective would either confirm or deny the statements," that he was trying "to lay the ground work. And then if she denies it, I can have the detective go on. And if he denies it, we can play the disk." (*Id.*). Counsel decided to introduce the disk containing the audio recording as an exhibit (Defendant's Exhibit A), which was admitted without objection. Counsel then moved on to a different line of questioning. During cross-examination of the detective, counsel asked him about his interview with Sara:

> Q. And do you remember the conversation where you said if there was male
>
> DNA on the clothes and she responded there is. Do you remember that?
>
> A. Yes, I do.
>
> Q. And you asked how do you know?
>
> A. I don't remember. I mean, I may have said that.
>
> Q. Would it help if we played it?
>
> A. Absolutely, sir. Please.

(*Id.* at 611-612). Counsel then played that portion of the audio recording containing these statements, which is transcribed in the trial transcript. The detective agreed that that was the conversation he had with Sara. Later in the trial, after an off-the-record discussion with the attorneys, the court noted:

> Defendant's Exhibit A will be marked, maintained as a part of the
>
> record but not sent back to the jury. The Court's prior explanation about the
>
> method of cross-examination still remains an issue or problem.
>
> If there's any prejudice, it would have been that the jury couldn't
>
> compare what was said to the investigator by the witness because it's in

oral form all over the various statements. There's no transcript to highlight it.

(*Id.* at 813-814).

**{¶ 78}** Kuck says that without a transcript there was no way to prove to the jury that Sara made the statements that counsel suggested she did. According to Kuck, because counsel did not have a transcript with which to impeach Sara, counsel simply abandoned his attempt to impeach her. But the trial transcript does not suggest that counsel abandoned his impeachment attempt for lack of an interview transcript. Rather, it appears that counsel was simply done asking about Sara's interview.

**{¶ 79}** Like he did with Sara, trial counsel asked Jane about some statements that she made during her interview with the same detective:

Q. [D]id you tell Detective Hawes—did you make the statement to Detective Hawes that Mr. Kuck is pretty rich?

A. No.

Q. Did you talk to Detective Hawes about getting a lawyer to sue him?

A. No.

Q. Did you ask Detective Hawes if he would provide you with a lawyer so you could sue him for his money?

A. No.

(*Id.* at 437). And the trial court, like it did during Sara's cross-examination, interrupted to tell counsel that he needed to introduce the statement that he was suggesting she made. Counsel told the court that there was an audio recording of Jane's interview but no transcript. He said that his plan was, like that with respect to the statements that Sara

denied making, to ask the detective if Jane made the statements and play the audio recording if necessary. Counsel did not ask the detective about Jane's statements and did not introduce the audio recording of her interview.

{¶ 80} Kuck says that because there is no transcription of the interview there was no way to prove to the jury that Jane made these statements to the detective, short of playing the recording. So counsel's cross-examination on these statements failed, says Kuck, and trial counsel simply moved on to the next topic. But as with Sara, the trial transcript suggests that counsel was simply done asking about Jane's interview.

{¶ 81} Counsel cross-examined both victims at trial using copies of their prior written statements. And parts of the recorded interviews were played during the trial. There is certainly nothing close to a showing here that the jury would have obviously come to different conclusions about Kuck's guilt if only transcripts of some pretrial interviews had been obtained and used.

### 3. *Failing to object to jury instructions*

{¶ 82} Kuck argues that trial counsel was ineffective for not objecting to the jury instructions about proving substantial impairment, which we considered under the fifth assignment of error. Kuck recasts the proposition of law there as ineffective assistance here because trial counsel failed to object. In our review of the fifth assignment of error, we rejected the underlying proposition on its merits. As the Ohio Supreme Court has recognized, "[t]he same reasoning, taken to its logical conclusion, also justifies our denial of [a defendant]'s *Strickland* claim." *McKelton*, 2016-Ohio-5735, at ¶ 295.

### 4. *Failing to object to the trial court's comments*

{¶ 83} Kuck argues that trial counsel was ineffective for not objecting to certain

comments made by the trial court about the State's burden of proof and the elements of rape. The trial court began voir dire by "talk[ing] a little bit about legal concepts." (Tr. 31). The court told the prospective jurors that the State must prove guilt and then explained:

> So the State of Ohio has to prove guilt but how much proof does it take? Well, there is a legal standard. The standard is called you have to be guilty beyond a reasonable doubt. The State has to prove its case beyond a reasonable doubt.
>
> Did anybody hear a number in there, what percentage that is? It's not.
>
> In a criminal case, there's no such number. Sometimes it drives people crazy. Proof beyond a reasonable doubt is not expressed as 99.9 percent. It's not expressed as 66 2/3 percent. It's not 75. It's not any kind of a number. You have to be thoroughly convinced about the truth of the charge.
>
> So what amount of evidence it takes for each of you to be thoroughly convinced is an individual decision. * * *
>
> * * * All I can tell you is the State of Ohio has to prove guilt beyond a reasonable doubt before somebody is no longer presumed innocent. Everybody understand the concepts?

(*Id.* at 31-33). Kuck says that the comments about percentages were inappropriate, because they confused the jury about the standard of proof and because they were made before a jury was even selected.

**{¶ 84}** The trial court also explained to the prospective jurors what the rape charges allege:

As to the first victim, the first count is engaging in sexual conduct when that person's ability to consent or to resist was impaired because of some sort of mental, physical or physiological condition.

The title of that's called rape but I don't like to use that word because it doesn't mean anything. So it's sexual conduct with another person when their ability to consent or resist is impaired.

(*Id.* at 49).

**{¶ 85}** Kuck says that these statements misstate the elements of rape under R.C. 2907.02(A)(1)(c), which requires not simply impairment but *substantial* impairment. Because trial counsel failed to object to this misstatement of the law, says Kuck, the jury, at the very beginning of the trial, was misled about what the State had to prove.

**{¶ 86}** When the trial court instructed the jury after the close of all evidence, it gave correct instructions of the law with respect to the standard of proof and the elements of rape. These instructions cured any misstatements or simplifications made by the court during voir dire, since "[t]he jury is presumed to follow the instructions given to it by the trial judge." (Citation omitted.) *State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶ 147. Because the court's statements during voir dire were not formal jury instructions, we do not think that counsel was required to object and he was not ineffective for not doing so.

### 5. *Failing to object to the admission of evidence*

**{¶ 87}** Lastly, Kuck argues that trial counsel was ineffective for not objecting to

hearsay, to improper leading questions, to questions prohibited by the rape-shield statute, and to character evidence regarding both Kuck's bad character and the victims' good character. We considered the underlying legal propositions in our review of the fourth assignment of error. Once again, Kuck recasts propositions of law as ineffective assistance. We rejected the underlying propositions on their merits, so we reject Kuck's ineffective assistance claim here.

{¶ 88} The first assignment of error is overruled.

### E. The sufficiency and weight of the evidence

{¶ 89} In the second and third assignments of error, Kuck respectively challenges the sufficiency of the evidence and claims that the jury's guilty verdicts are against the manifest weight of the evidence. The Ohio Supreme Court has recently reiterated the standards for these two challenges:

A challenge to the sufficiency of the evidence supporting a conviction requires that we consider "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). We will not "disturb a verdict on appeal on sufficiency grounds unless 'reasonable minds could not reach the conclusion reached by the trier-of-fact.' " [*State v.*] *Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, at ¶ 94, quoting *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997).

In contrast [to a sufficiency challenge], a manifest-weight challenge "concerns 'the inclination of the *greater amount of credible evidence* * * * to support one side of the issue rather than the other.' " (Emphasis sic.) *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990). A manifest-weight challenge requires us to consider the entire record, including the credibility of the witnesses, the weight of the evidence, and any reasonable inferences and determine whether " 'the [panel] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983); *accord* R.C. 2953.02.

*State v. Montgomery*, Ohio Sup.Ct. Slip Opinion No. 2016-Ohio-5487, ¶ 74-75. As to the credibility of witnesses, we defer to the jury's determinations:

Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness.

*State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997).

### 1. *Rape and sexual battery*

**{¶ 90}** Kuck was convicted of rape under R.C. 2907.02(A)(1)(c), which prohibits

sexual conduct with another when "[t]he other person's ability to resist or consent is substantially impaired because of a mental or physical condition * * *, and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition." And he was convicted of sexual battery under R.C. 2907.03(A)(2), which prohibits sexual conduct with another when "[t]he offender knows that the other person's ability to appraise the nature of or control the other person's own conduct is substantially impaired." Kuck's sufficiency and weight arguments focus on whether the victims were substantially impaired and what he knew about their impairment.

### a. Substantial impairment

{¶ 91} The Ohio Supreme Court has held that "substantial impairment must be established by demonstrating a present reduction, diminution or decrease in the victim's ability, either to appraise the nature of his conduct or to control his conduct." *State v. Zeh*, 31 Ohio St.3d 99, 104, 509 N.E.2d 414 (1987). " ' "Substantial impairment" need not be proven by expert medical testimony; it may be proven by the testimony of persons who have had some interaction with the victim and by permitting the trier of fact to obtain its own assessment of the victim's ability to either appraise or control her conduct.' " *Hatten*, 186 Ohio App.3d 286, 2010-Ohio-499, 927 N.E.2d 632, at ¶ 21, quoting *State v. Dorsey*, 5th Dist. Licking No. 2007-CA-091, 2008-Ohio-2515, ¶ 43. "[V]oluntary intoxication is a 'mental or physical condition' that could cause substantial impairment under R.C. 2907.02(A)(1)(c)." *Id.*

{¶ 92} We consider first the evidence supporting the jury's finding that Sara's ability to resist or consent to sexual conduct with Kuck was substantially impaired because of a

mental or physical condition. Sara testified that soon after she arrived at the bar she drank two shots and half a beer, which Kuck had brought to her. She said that after the second shot she felt very tired, so she went out to her car where she fell asleep. Her girlfriend came out and woke her up, and Sara "felt really weird, like, physically, like something wasn't right." (Tr. 255). Sara said that she then went back into the bar and drank the shot that Kuck handed her. Said Sara: "And I remember after I took it, it just—I just—something didn't feel right and I was really tired still and I remember looking across the clock in the bar and then it felt like my knees were about to collapse." (*Id.* at 212). The battery in her cell phone was dead, so she went to her car to recharge it. "And then I don't remember getting to my car but I remember walking out the front of the bar and there was like a crowd of people that weren't there previously that were just standing out front. And I walked through them and then I don't remember what happened." (*Id.* at 213, 258). The next thing she remembered was Kuck waking her up by knocking on her car window or opening the car door. Then she blacked out: "I didn't fully make it out of my car. I wasn't walking wobbly. I stood up and then I blacked out." (*Id.* at 260). Then:

> I remember waking up but I didn't open my eyes yet because I felt something. I felt—I felt him [Kuck] penetrating me with his penis in my vagina, and I didn't know what was going on. But then I moved my hips around and I remember I heard him grunt twice and then my head was down and I shot it up and I yelled "What the f**k?" And he took off running.
>
> And then I remember I was so confused and mad and I didn't know what was going on and I couldn't stand though. And then I took a few steps to my right and I remember passing out on something which I later found

was an air conditioner but then I don't remember nothing else.

(*Id.* at 214). She also said, "I remember wanting to chase him but I couldn't move. I just took a few staggers to the right and just passed out on an object which I later found out was an air conditioner. And then the rest of the night nothing besides at one point I remember for like two seconds waking up in the back of his truck and watching—looking at him and [her girlfriend] talking." (*Id.* at 216). The next thing she remembered was waking up at her girlfriend's home. (*Id.* at 217).

**{¶ 93}** Viewing the evidence in a light most favorable to the State, a rational trier of fact could have found, beyond a reasonable doubt, that Sara's ability to appraise the nature of, or to control her conduct was reduced, diminished or decreased. That she repeatedly blacked out and had lapses of memory suggests this most strongly. As to the weight of the evidence, we cannot say that the jury clearly lost its way and created a manifest miscarriage of justice by finding that Sara's ability either to appraise the nature of her conduct or to control her conduct was reduced, diminished or decreased.

**{¶ 94}** Next we consider the evidence supporting the jury's finding that Jane's ability to appraise the nature of, or control her conduct was substantially impaired. Jane's testimony shows that she had a large amount to drink that night. She testified that she had two drinks before leaving home around 11:00 p.m. Then she had three shots at The Triangle. After she arrived at Kuck's bar, around 1:30 a.m., she had anywhere from five to ten shots, all of which she consumed in about an hour.

**{¶ 95}** We have said that the consumption of a large amount of alcohol over the course of just a few hours is sufficient evidence to find that the victim was substantially impaired. *Hatten*, 186 Ohio App.3d 286, 2010-Ohio-499, 927 N.E.2d 632, at ¶ 22 (over

the course of the evening and early morning, the victim drank half a pitcher of beer, three cans of beer, and seven shots of alcohol). Here, Jane consumed at least ten alcoholic drinks that night. The consumption of that amount of alcohol is sufficient evidence for reasonable jurors to find, beyond a reasonable doubt, that her ability either to appraise the nature of her conduct or to control her conduct was reduced, diminished, or decreased. And we cannot say that the jury clearly lost its way and created a manifest miscarriage of justice by finding that Jane's ability to appraise the nature of or control her own conduct was substantially impaired.

### b. Knowledge of substantial impairment

{¶ 96} To prove rape under R.C. 2907.02(A)(1)(c), the State must establish not only that the other person was substantially impaired but also that the defendant knew or had reasonable cause to believe that the other person's ability to resist or consent was substantially impaired because of a mental or physical condition. Similarly, to prove sexual battery under R.C. 2907.03(A)(2), the State must establish that the defendant knew that the other person's ability to appraise the nature of or control the other person's own conduct was substantially impaired. Kuck argues that there is insufficient evidence to support finding that he knew or had reasonable cause to believe that either Sara or Jane was substantially impaired and that the manifest weight of the evidence is against this finding.

{¶ 97} Sara's testimony suggests that during her blackouts that night she was unconscious. Kuck could not have failed to notice this. That she was unconscious during the sexual conduct did not simply impair Sara from resisting or consenting but precluded either all together. The evidence is sufficient. And the jury did not clearly lose its way and

create a manifest miscarriage of justice by finding that Kuck knew or had reasonable cause to believe that Sara's ability to appraise the nature of her conduct or to control her conduct was reduced, diminished or decreased.

{¶ 98} As to Jane, she testified that all the alcoholic drinks that she consumed at the Backroads Bar were given to her by Kuck personally. So he knew that she had consumed a significant amount of alcohol in a short period. This is sufficient evidence to find that Kuck knew that Jane's ability to appraise the nature of or control her own conduct was substantially impaired. And we cannot say that the jury clearly lost its way and created a manifest miscarriage of justice by finding that Kuck knew that Jane's ability to appraise the nature of or control her own conduct was substantially impaired.

### 2. *Furnishing alcohol*

{¶ 99} Kuck was convicted of furnishing alcohol to both Sara and Jane under R.C. 4301.69(A), which states that "no person shall sell beer or intoxicating liquor to an underage person, shall buy beer or intoxicating liquor for an underage person, or shall furnish it to an underage person." He argues that there is no evidence that he knew that either victim was underage.

{¶ 100} A violation of R.C. 4301.69(A) is a strict-liability offense. *See Lesnau v. Andate Enterprises, Inc.*, 93 Ohio St.3d 467, 473, 756 N.E.2d 97 (2001) (saying that "R.C. 4301.69(A) imposes strict liability for a criminal violation of that section"); *State v. Spicer*, 2d Dist. Greene No. 93 CA 55, 1994 WL 102097, *3 (Mar. 30, 1994) (saying that "culpability is not required for commission of that offense [R.C. 4301.69(A)]"). Therefore that Kuck knew that either victim was underage is not something that the State had to prove.

{¶ 101} Kuck also argues that there is insufficient evidence to support finding, and that the manifest weight of the evidence is against finding, that he personally provided alcohol to Jane. Jane herself testified that he gave her alcoholic drinks. This evidence is sufficient to find that Kuck furnished Jane with alcohol. As to the weight of the evidence, there is testimony that Kuck provided only non-alcoholic drinks to Jane and testimony that she did not drink anything at the bar. We defer to the jury's credibility determinations on this matter. We cannot say that the jury clearly lost its way and created a manifest miscarriage of justice by finding that Kuck provided Jane with alcoholic drinks.

{¶ 102} The second and third assignments of error are overruled.

### III. Conclusion

{¶ 103} We have overruled each of the six assignments of error presented. Therefore the trial court's judgment is affirmed.

. . . . . . . . . . . . .

FAIN, J., and WELBAUM, J., concur.

Copies mailed to:

R. Kelly Ormsby, III
Dwight D. Brannon
Kevin A. Bowman
Douglas D. Brannon
Matthew C. Schultz
Hon. Jonathan P. Hein