[Cite as *State v. Holden*, 2025-Ohio-1481.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 30270 |
| | : | |
| v. | : | Trial Court Case No. 2023 CR 00655 |
| | : | |
| DEANTE TAVIANN HOLDEN | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on April 25, 2025

. . . . . . . . . . .

CHRISTOPHER BAZELEY, Attorney for Appellant

MATHIAS H. HECK, JR., by MICHAEL P. ALLEN, Attorney for Appellee

. . . . . . . . . . . .

HANSEMAN, J.

{¶ 1} Defendant-Appellant, Deante Taviann Holden, appeals from his convictions for murder and tampering with evidence. According to Holden, his convictions were not supported by sufficient evidence and were against the weight of the evidence. He further

asserts that trial counsel rendered ineffective assistance by failing to cross-examine witnesses and by failing to move for acquittal under Crim.R. 29. Additionally, Holden argues the trial court violated his right of allocution by failing to let him or his attorney respond to victim impact statements. Finally, Holden asserts the trial court erred by imposing restitution without considering his present and future ability to pay.

{¶ 2} For the reasons discussed below, we conclude that Holden's assignments of error lack merit. Accordingly, the judgment of the trial court will be affirmed.

## I. Facts and Course of Proceedings

{¶ 3} In March 2023, an indictment was filed in the trial court, charging Holden with four counts of murder, all with firearm specifications, four counts of felonious assault, again with firearm specifications, and three counts of tampering with evidence. These charges arose from the deaths of Felicia Brown and Michaela Daniels on February 26, 2023. On March 14, 2023, Holden pled not guilty to the charges, and the court ordered bail set at $1,000,000 surety bond. In April 2023, Holden filed a waiver of speedy trial time requirements, and in October 2023, he filed a notice of his intent to present the affirmative defense of self-defense. The State opposed the filing of this notice, arguing that Holden had failed to comply with requirements for asserting it.

{¶ 4} In November 2023, Holden's counsel asked to withdraw due to a breakdown in communications. The trial court granted the request and appointed new counsel. In December 2023, the court set trial for July 22, 2024. Counsel again changed in January

2024, with another attorney appointed, and in June 2024, this attorney filed another notice of an intent to assert self-defense. The State did not file an objection to this notice.

{¶ 5} The trial began as scheduled on July 22, 2024. After both sides presented evidence, the jury found Holden guilty of all charges. At the sentencing hearing, the court merged counts two through four into count one, and counts six through eight into count five (thus merging all of the offenses as to each victim into the murder count). The court sentenced Holden to 15 years to life for each murder conviction, plus three years each for two firearm specifications, and three years each on counts nine through 11 (the tampering charges). The court imposed the prison terms consecutively, for an aggregate sentence of 45 years to life in prison. Termination Entry (Aug. 8, 2024), p. 1-2. The court also ordered Holden to pay restitution for the victims' funeral expenses. *Id.* at p. 2-3.

{¶ 6} The rest of the relevant facts will be discussed when we consider the assignments of error. Holden timely appealed from the trial court's judgment.

II. Sufficiency of the Evidence and Manifest Weight of the Evidence

{¶ 7} Holden's first assignment of error states that:

Holden's Convictions for Murder, Felonious Assault, and Tampering with Evidence by Removing Shell Casings from the Scene are Not Supported by Legally Sufficient Evidence or the Weight of the Evidence.

{¶ 8} Under this assignment of error, Holden first contends the State failed to present legally sufficient evidence that he was not acting in self-defense when he shot

and killed Brown and Daniels. According to Holden, he satisfied his burden of producing evidence that he shot the two women in self-defense, and the State failed to provide any evidence that he initiated violence or had the motive to be the aggressor. In addition, Holden argues that the State failed to provide evidence that his fear was objectively or subjectively unreasonable. Holden also claims the State failed to establish that he tampered with the evidence. We will begin with the murders, while noting that Holden has not specifically addressed manifest weight, even though he raised it. Because the felonious assault offenses were merged into the murders after the jury's findings of guilty, we need not address those offenses separately.

## A. The Alleged Murders

**{¶ 9}** In responding to Holden's arguments, the State notes that Holden did not dispute at trial that he shot and killed Brown and Daniels. State's Brief, p. 8. This is correct. *See* Tr. at 830. Consequently, the only issue was whether Holden acted in self-defense. " 'A self-defense claim includes the following elements: (1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he [or she] was in imminent danger of death or great bodily harm and that his [or her] only means of escape from such danger was in the use of such force; and (3)

that the defendant did not violate any duty to retreat or avoid the danger.' " *State v. Messenger*, 2022-Ohio-4562, ¶ 14, quoting *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002).[1]

{¶ 10} As relevant here, R.C. 2901.05(B)(1) states that, "A person is allowed to act in self-defense. . . . If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, . . . the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense. . . ." "In 2019, the General Assembly modified the burden-of-proof requirements for affirmative defenses, including self-defense, via an amendment to R.C. 2901.05." *State v. Palmer*, 2024-Ohio-539, ¶ 17. While the amendment shifted the burden of persuasion to the State, it "did not eliminate a defendant's burden of production," and a defendant must "present qualitative evidence supporting each element of self-defense." *Id.* at ¶ 19.

{¶ 11} Here, the State agrees Holden satisfied his burden of production and that it then had to prove beyond a reasonable doubt that Holden did not act in self-defense. State's Brief at p. 8. Nonetheless, that does not mean that sufficiency of the evidence is

---

[1] Concerning the duty to retreat, a 2021 amendment to R.C. 2901.09 "reduced and simplified the standard in division (B) as follows: 'For purposes of any section of the Revised Code that sets forth a criminal offense, a person has no duty to retreat before using force in self-defense, defense of another, or defense of that person's residence if that person is in a place in which the person lawfully has a right to be.' " *State v. Miree*, 2024-Ohio-5714, ¶ 8, quoting R.C. 2901.09(B). The trial court properly instructed the jury on this point. Tr. at 917. Therefore, if Holden was lawfully present, he did not have a duty to retreat.

the proper legal test. The Supreme Court of Ohio considered this point in *Messenger*. In that case, the defendant argued that, "[b]ecause the state must prove all elements of an offense beyond a reasonable doubt and because the state must now prove lack of self-defense beyond a reasonable doubt, . . . both must be examined under a sufficiency-of-the-evidence standard." *Messenger* at ¶ 16. The court disagreed, remarking that this argument failed "to account for the difference between the nature of the evidence and the strength of a conclusion regarding that evidence." *Id.* In this regard, the court stressed that: "Reasonable doubt speaks to the extent to which the fact-finder must be convinced that a party met its burden of persuasion. . . . The reasonable-doubt standard does not apply to whether a party has met its burden of producing legally sufficient evidence in the first place; if a party fails to meet its burden of production, the fact-finder cannot consider the claim at all, let alone how persuasive the evidence was." *Id.* at ¶ 17.

{¶ 12} The court further observed in *Messenger* that while "the state has the burden of production regarding the elements of a criminal offense because an accused person has the right to a presumption of innocence on each element," "there is no due-process right to a presumption of an affirmative defense such as self-defense." *Id.* at ¶ 18-19. In addition, the court stressed that "the amendment to R.C. 2901.05(B)(1) was procedural, not substantive, in nature." *Id.* at ¶ 22, citing *State v. Brooks*, 2022-Ohio-2478, ¶15-16. "The amendment changed the procedure for adjudicating criminal cases involving evidence of self-defense; it did not make substantive changes to the elements of any offenses." *Id.*

{¶ 13} Consequently, the court held that "[t]he state's new burden of disproving the defendant's self-defense claim beyond a reasonable doubt is subject to a manifest-weight review on appeal, and the Tenth District correctly declined to review the state's rebuttal of self-defense for sufficiency of the evidence." *Id.* at ¶ 27.

{¶ 14} Applying *Messenger* here, the proper review is for manifest weight, not sufficiency. "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other.' " (Emphasis in original.) *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Black's Law Dictionary* (6th Ed.1990). The applicable role for review is that " '[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶ 15} Furthermore, "[b]ecause the factfinder, be it the jury or . . . the trial judge, has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the

testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 1997 WL 476684, *4 (2d Dist. Aug. 22, 1997).

{¶ 16} To satisfy its burden, "the State must disprove beyond a reasonable doubt at least one of the elements of self-defense." *State v. Bowen*, 2024-Ohio-1079, ¶ 12 (2d Dist.), citing *State v. Gutierrez*, 2023-Ohio-3122, ¶ 72 (11th Dist.). As noted, " '[t]he elements of self-defense in the use of deadly force are: (1) the defendant was not at fault in creating the situation giving rise to the affray; [and] (2) the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such a danger was in the use of such force.' " *State v. Shaw*, 2025-Ohio-301, ¶ 40 (2d Dist.), quoting *State v. Tunstall*, 2024-Ohio-2376, ¶ 16 (2d Dist.).

{¶ 17} Concerning the first element, Holden contends he was not at fault in creating the situation. For this, he relies on his own testimony. "However, a conviction is not against the manifest weight of the evidence simply because the trier of fact believed the State's version of events over the defendant's version." *State v. Barker*, 2025-Ohio-56, ¶ 26 (2d Dist.), citing *State v. Lindsey*, 2015-Ohio-2169, ¶ 43 (10th Dist.). "The jury is the sole judge of the weight of the evidence and the credibility of witnesses. It may believe or disbelieve any witness or accept part of what a witness says and reject the rest." *State v. Antill*, 176 Ohio St. 61, 67 (1964). Moreover, Holden's testimony was contradicted by other evidence. and the jury may have found that it was not believable. We also note the

established principle that the State is not required to prove motive to secure convictions for murder or felonious assault. *E.g.*, *State v. Diallo*, 2025-Ohio-920, ¶ 23 (10th Dist.).

{¶ 18} According to Holden, on the evening of February 25, 2023, Brown and Daniels came to his house and "hung out" as friends for about an hour and a half, during which time they all drank alcohol. They then left the house, planning to go to a casino in Monroe, Ohio. Holden offered to drive, but the radio in his truck had been stolen. Consequently, they took the vehicle that Brown was driving, which was a 2007 Chevy Suburban. Holden sat in the back seat, and Daniels was in the front passenger seat. Tr. at 680, 788-791, and 795.

{¶ 19} During the drive, they were drinking Patron and Teremana tequila. Holden was drinking from a Patron bottle, and the women were drinking from a Teremana bottle. Holden heard Daniels make a phone call and, following that call, both women were agitated. After the call, they were traveling west on Third Street in Dayton, and Holden thought Brown would turn left on a street called Brooklyn and travel toward U.S. 35. However, instead of turning left, Brown began driving erratically, getting the car up to 60 m.p.h., and running the red light at Brooklyn. They then continued to travel west on Third Street. *Id.* at 792-796.

{¶ 20} When that occurred, Holden asked what was going on. He learned they were not going to the casino as planned, but to a "bootleg" or club of a friend of Brown. Brown had also been talking to that person on Daniels's phone. Holden told them that he was not going to go to a bootleg at 2:00 in the morning. He testified that he did not go to

places like that; he also had $10,000 in cash that he had intended to use at the casino. Holden asked the women to drop him off at a friend's house so he could get one of the friend's cars. He said he would then follow them, but they refused to let him out of the car. They continued to be agitated by his statements and by the person who had called them. As they approached the light at the intersection of Third Street and Gettysburg Avenue, the phone call with the other person resumed. Brown was visibly upset at what that person was saying. *Id.* at 797-800 and 802.

{¶ 21} When the car was idling at the intersection, Holden demanded to get out, and a "lot of words" were said. However, the women did not let him out. After that, Holden reached down to grab his glasses, which had fallen on the floor, and as he leaned up, Daniels hit him with the Patron bottle. She hit him three times with the bottle: above his right eye, on his nose, and on his shoulder. According to Holden, he did not do anything to provoke Daniels; he was just agitated by not being allowed to get out of the car, by the conversation he had overheard, and by where they were headed. Tr. at 801-804.

{¶ 22} Later in his testimony, Holden said Daniels hit him hard on the head twice and three times in the nose, that it was painful, that it bled a lot, and that his blood was on the Patron bottle. In addition, he said that while they were in the intersection, Brown hit him on the right side of his eye and jaw with the Patron bottle. According to Holden, he was not dazed by Daniels's blows but was dazed when Brown hit him. Brown turned into a Shell gas station on the corner of the intersection and parked at pump 4. *Id.* at 805-807 and 831.

{¶ 23} When the vehicle stopped at the pump and Holden came out of his daze, he tasted blood in his mouth and his nose was bleeding. He heard commotion in the car, and the women were yelling over the phone. Holden then jumped back behind the driver's seat and fired his firearm into the dashboard; the doors were then unlocked. At that point, Holden was able to get out of the car. When he did, he stood there, dazed. Although he wanted to try to get out of the situation, he was so dizzy and seeing stars that he stood there for a second. As he did, he heard, "He has his gun on him, he has his gun on him." *Id.* at 807-808. Holden looked in the car and saw both women reaching for a small compact gun that was in the cup holder in the front seat. Holden said he fired again out of fear when they reached for the firearm. The video obtained from the Shell station showed seven casings going up into the air when Holden fired into the vehicle. The shootings occurred at around 2:24 a.m. *Id.* at 232-235, 388, 389, 571, 586, 736, and 836. An attendant, M.M., was working as a cashier at the gas station that night, and his uncle was also there visiting with M.M. Although M.M. heard the gunshots, he did not call the police at that time. *Id.* at 314-316 and 324-326.

{¶ 24} After firing the shots, Holden took his gun and left the scene. He did not call 911 to say he had been the victim of a crime, did not call to summon medical help for the women, and did not call at any time to report a crime before being arrested on February 28, 2023. Holden ran from the scene and walked north on Gettysburg to a nearby church, the Macedonia Missionary Baptist Church. At the time, Holden was wearing a purple Colorado Rockies hat with a hatpin on the back. He left the hat in a flowerbed next to the

church, ostensibly because it was hurting his head. While on the church property, Holden made a number of phone calls, including to Brown, to his mother, and to his sister, who picked him up and took him home. Holden's call to Brown's phone occurred at around 2:36 a.m., i.e., about 12 minutes after he shot her and left the gas station. According to Holden, when he arrived home, he wiped off his face, gathered his jewelry and funds, and went to his mother's house. He then stayed at his mother's house; he also said he did not talk to anyone else that night. Around 4:00 a.m., forensic analysis placed the cell phone of Holden's mother at the Shell station, and video evidence from the station indicated the presence of a car similar to her blue BMW. Holden also confirmed that his mother went to the gas station that night. Tr. at 232, 455, 538, 591, 687, 690, 708, 723-724, 737, 814-819, 830, 832, and 834, and State's Ex. 101.

{¶ 25} At the time of the shootings, Holden was friends with D.O. and D.A.; they had all grown up together in the same neighborhood. On February 25, D.A. had picked up D.O., and they had gone together to a birthday party, where they stayed until the early morning hours of February 26. *Id.* at 340-344. At around 3:28 a.m., Holden made two phone calls to D.O.; he also made another call and a FaceTime video call to D.O. at 3:29 a.m. *Id.* at 539 and State's Ex. 101.

{¶ 26} According to D.O., Holden called D.A. and asked for one of them to come and get him.[2] At that time, D.O. and D.A. were leaving their party to go to another party. Instead, they picked up Holden and went to Holden's grandmother's home, which was located on Athens Road in Dayton, Ohio. They stayed at the house for about 30 minutes, then all three of them left in D.A.'s car. D.O. testified that they planned to go to the other party but did not end up going. They were going to get some "Black & Milds" at the gas station, but when they stopped at a light, Holden abruptly got out of the car. They followed in pursuit, and when they got to the Shell station, Holden was standing outside a black truck just looking around. Forensic analysis of D.O.'s cell phone indicated that it had been present at the Shell station between around 4:44 a.m. and 4:54 a.m. on February 26. Forensic analysis also showed that the cell phones of Brown and Daniels were at the gas station at that time. *Id.* at 344-348, 539, 591-592, State's Ex. 96D, and State's Ex. 101.

{¶ 27} As noted, M.M., the Shell station attendant, said he heard gunshots around the time of the crime but did not call the police. About three hours later, his uncle noticed that a car had been parked at the station for two to three hours. M.M. went outside because it looked like someone was trying to open the door of the car. M.M. had a cell phone and recorded some of what he observed. He saw a man (later identified as Holden) who looked like he was searching for something, and he saw Holden grab something out

---

[2] The records obtained from Holden's phone revealed that the call was to D.O., not D.A. A forensic expert also analyzed D.A.'s cell phone, but he could not find any relevant information. D.A. was subpoenaed, but he refused to testify at trial, asserting his Fifth Amendment rights. Tr. at 571 and 596-602.

of the car. M.M. told Holden not to take anything because he was about to contact the police. M.M. then saw another car (a black car) pull up and park at the air pump. At that point, M.M. ran inside the station to contact the police. He then came back outside. Tr. at 326-331.

{¶ 28} When M.M. came back out, two men were around the Suburban, and it looked like they were trying to grab something out of the car. M.M. again told them not to take anything. The driver of the black car never got out. M.M.'s uncle joined him outside, and they were both recording on their cell phones. M.M. went back inside the store and saw the black car leaving. *Id.* at 332-334. Both M.M. and his uncle gave their cell phone videos to the police. M.M.'s video, which began earlier, showed both women's cell phones in the car; his uncle's video, taken shortly thereafter, showed no cell phones in the car. Daniels's phone had been to the side of her body, and Brown's phone had been up against her body. *Id.* at 332-334 and 717-722.

{¶ 29} Based on the surveillance video from the Shell station, no one went near the Suburban and "messed" with anything between the time that Holden first left the scene and when he returned at around 4:44 a.m. According to D.O., when he arrived at the gas station, Holden was opening a door of the Suburban. Holden said it looked like something had happened there. When D.O. asked what had happened, Holden said he did not know. D.O. saw two people inside the Suburban who were not responsive. When the gas station attendant came outside, D.O. told him that he had better call the police because two people were not responsive. D.O denied taking anything from the car. He also said he

saw Holden ducking down but did not see him take anything. Once M.M. and his uncle said they had alerted the police, D.O. and Holden got back in the black car and left. D.O. stated that he continuously had asked Holden what had happened because something did not look right. However, Holden stated that he did not know what had occurred. *Id.* at 348-353 and 735-736.

{¶ 30} A panic alarm from the Shell station came into the Montgomery County Regional Dispatch Center at 4:53 a.m. on February 26, 2023. The police arrived at the station at around 4:57 a.m. The first person on the scene was Officer Puderbaugh, who looked through the Suburban's window, saw people with multiple gunshot wounds, and called for a medic. He ran to the driver's side, checked for a pulse, and saw no signs of life. He also did not see any guns. Puderbaugh then set up a scene perimeter. By 5:15 a.m., an evidence technician was on the scene. Tr. at 362-367, 373, and 723, and State's Ex. 44A.

{¶ 31} Forensic analysis of the time between 4:55 and 5:29 a.m. on February 26 showed the cell phones of D.O., Brown, and Daniels leaving the area of the Shell station and moving in a westerly direction. The phones then moved to the south and toward downtown Dayton. The last activity on Daniels's phone was at about 5:17 a.m. in the downtown area. D.O.'s phone then progressed northwest. The next activity on Brown's phone was on February 26, 2023, at around 3:15 p.m. At that time, the phone was located on a cell cycle sector south on Interstate 71, in the King's Island area. The women's cell phones were never found. *Id.* at 684. According to a cellular analyst, the fact that cell

phone activity occurs does not mean that a phone is being used to text or to make calls; cell phones generate data sessions with cell phone towers of which users are not aware. In addition, timing advance happens behind the scene at phone networks when the network reaches out to measure where subscribers are. *Id.* at 584-585 and 591-594, and State's Ex. 101.

**{¶ 32}** Despite the fact that seven shots were fired, only three casings were located at the scene. Two Auto SIG 45-caliber casings were in the back seat on the floor, and one Auto SIG 45-caliber casing was found outside the driver's door, under the truck. A forensic comparison revealed that the same firearm fired all three casings. *Id.* at 425-429 and 496-498. The police searched the Suburban, the car D.A. drove, the area around the church, and the homes of Holden and his mother. No firearms or additional casings were ever found, and no gun was found in the Suburban, and the victims' cell phones were never located. *Id.* at 432, 681 687-689, and 694. Holden admitted that he had removed the two cell phones and a firearm from the car, but he denied that he took any casings. *Id.* at 821 and 836. Although the Patron bottle was found, there is also no indication that the police ever found a Teremana tequila bottle in the Suburban.

**{¶ 33}** Det. Angela Woody was the lead homicide detective on the case. Woody received notice of the homicides at 5:11 a.m. on February 26 and arrived at the scene around 5:48 a.m. The police obtained surveillance video from the Shell station and from a BP gas station. While the BP video was vague, they could see a person taking flight and heading north on Gettysburg Avenue, next to the Macedonia church. When daylight

came, the police searched that area and found a purple hat. The evidence technician collected the hat and saw no blood on it. If she had, she would have placed a biohazard sticker on the packaging for the hat. Woody also did not see any blood on the hat. Right after finding the hat, Woody was able to view some video from the Shell station, as the manager was then available. The police submitted the hat to the Ohio Bureau of Criminal Investigation (BCI) on Monday, February 27, 2023, because BCI was not open on Sunday, the day of the murders. A DNA expert at BCI swabbed the interior band of the hat, and on March 1, 2023, provided the police with a preliminary report that associated the hat with Holden's name. The expert generated a second report after BCI received Holden's DNA sample. According to the expert, Holden was the major contributor of the DNA on the hat, with a probability of being rarer than one trillion individuals. (Earth has less than a trillion people.) The expert also said she did not see any blood on the hat. Tr. at 455-458, 629-642, 677-678, 687-689 and 691-693,

{¶ 34} In the meantime, the police were able to identify the black car (a Chrysler 200) that came to the Shell station after the shootings occurred. They stopped that car at around 8:00 a.m. on February 28, 2023. The driver was D.A. Before that occurred, Holden's name had come up in a search of Brown's phone records, and the police had gone to the Athens Avenue address (as that was his listed address) to see if the Chrysler 200 was there. Later that day, Det. Woody went back to the Athens address, but no one answered the door. While Woody was at the house, Holden's mother drove up in a blue BMW that was similar to the one that had been at the Shell station after the shootings.

She allowed the police to come inside the house. When Holden did not answer her, his mother brought him downstairs, and the police took him into custody. *Id.* at 699-703 and 705-709.

{¶ 35} According to Det. Woody, the police are required to document any pre-existing injuries when making arrests. Woody was present at the house and could clearly see Holden's face and neck, but she did not observe any signs of injury. That day, Holden was booked into jail, and he did not ask for medical treatment before being booked; in fact, the jail will not accept persons who are injured or complain of being injured. The jail requires such people to be taken directly to a hospital, as the jail does not want to pay for their treatment. Before Holden was booked into the jail, Woody also interacted with him at the Safety Building. Again, she did not observe any injuries. *Id.* at 710-713. The video of that brief interview and pictures taken at the Safety Building reveal no visible signs of injury. *See* State's Exs. 106, 106A, and 106(B).

{¶ 36} Holden contends that he was not at fault in creating the situation. However, the jury could have reasonably found that the evidence indicated otherwise. Although Holden claimed the women both reached for a gun, no gun was ever found. The jury may have concluded that, if Holden's version of events were true, he would not have removed the gun, since its presence would have helped substantiate his story. More importantly, however, the police asked Kevin Horan, the expert who conducted the cell phone forensic analysis, to review Brown's and Daniels's cell phone records for the time period between 1:00 a.m. and 2:30 a.m. on February 26, 2023. The police also asked Horan to determine

if there were any incoming or outgoing calls for these two phones between 2:00 a.m. and 2:30 a.m. on that day. Horan stated that there were no incoming or outgoing calls for either phone during that period. Tr. at 604-605. This contradicted Holden's testimony that the women had been on phone calls that caused them to be agitated during this time.

{¶ 37} Horan further testified that between 12:54 a.m. and 1:58 a.m. on February 26, the cell phones of Holden, Brown, and Daniels were in the same general area. Then, around 2:12 a.m., all three phones began to move in a southerly direction. The phones then began traveling from east to west and to move progressively toward the Shell station. *Id.* at 585-586 and State's Ex. 101. This was consistent with Holden's testimony that the women "hung out" at his house for about an hour and a half and they then left to go to the casino. Horan's testimony that, between 2:00 a.m. and 2:30 a.m., when Brown and Daniels were traveling in the car with Holden, the women did not make or receive any calls could have led the jury to reasonably conclude that Holden's claims about their agitation and the cause of the altercation were untrue.

{¶ 38} In addition, Holden's claim of being repeatedly hit with a bottle was belied by any lack of visible injury. Given the intensity and number of alleged blows, bleeding, and pain he described (as well as that he had a "busted nose" and "cracked tooth"), the jury could have concluded that there would have been visible signs of an injury. However, no one who saw Holden after the shootings or within the next two days testified that they saw any injury. Holden claimed that the "swelling" had gone down by the time of his arrest and that he sought treatment in the jail. Tr. at 832. But Holden could have subpoenaed

jail records or witnesses to support his account; he did not do so, and State's evidence, including the testimony of Det. Woody, contradicted Holden's claims.

**{¶ 39}** Furthermore, while the State did not test the Patron bottle (which had blood on it), Det. Woody testified that nothing was brought to the State's attention to indicate the bottle was relevant. She also said that in other cases, she had submitted evidence to BCI for testing at the request of the defense. *Id.* at 727.

**{¶ 40}** Holden filed his first notice of self-defense on October 3, 2023, nearly 10 months before the trial. If the Patron bottle was relevant to his defense, Holden's counsel could have asked for it to be tested. Certainly, there was ample time for testing. In June 2024, Holden filed a second notice of self-defense. This time, rather than saying nothing about the defense, he stated that, pursuant to Crim.R. 12.2: "Defendant reports no prior incidents with the decedents, and as such, there are no witnesses to provide on the limited issue of self defense." Notice of Self Defense (June 27, 2024), p. 1. This was the extent of the information Holden provided.

**{¶ 41}** "In response to the Ohio General Assembly shifting the burden of proof in self-defense cases from the defendant to the prosecution, Ohio added Crim.R. 12.2, which requires the defendant to file a written notice, prior to trial, providing [his] intent to raise a self-defense argument." *State v. Hawkins*, 2024-Ohio-1253, ¶ 1 (1st Dist.). Crim.R. 12.2 states, in pertinent part, that:

> Whenever a defendant in a criminal case proposes to offer evidence
> or argue self-defense, . . . the defendant shall, not less than thirty days

before trial in a felony case . . . , give notice in writing of such intent. The notice shall include specific information as to any prior incidents or circumstances upon which defendant intends to offer evidence related to conduct of the alleged victim, and the names and addresses of any witnesses defendant may call at trial to offer testimony related to the defense. If the defendant fails to file such written notice, the court may exclude evidence offered by the defendant related to the defense, unless the court determines that in the interest of justice such evidence should be admitted.

**{¶ 42}** Crim.R. 12.2 is a procedural rule, not an evidentiary one. *State v. Watson*, 2023-Ohio-3137, ¶ 44 (5th Dist.). The rule also refers to "prior incidents or circumstances." Cases applying this rule have certainly involved prior interactions of a victim and defendant that show the victim's aggression. However, they have also involved conduct that relates solely to the specific incident at issue. *Compare State v. Walters*, 2023-Ohio-2701, ¶ 10 (2d Dist.) (involving nine instances where the victim was allegedly violent in such a way that the defendant was justified in fearing him), and *State v. Bender*, 2024-Ohio-1750, ¶ 5 (3d Dist.) (Crim.R. 12.2 notice involved only events occurring during the actual fight between the victim and the defendant). As a result, Holden's mention of "no prior incidents" with the victims was not at all informative.

**{¶ 43}** "The Ohio Supreme Court has recognized that '[t]he philosophy of the Criminal Rules is to remove the element of gamesmanship from a trial.' " *State v. Lathan*,

2024-Ohio-2514, ¶ 68 (6th Dist.), quoting *State v. Howard*, 56 Ohio St.2d 328, 333 (1978). "The discovery rules are intended to 'prevent surprise and the secreting of evidence favorable to one party . . . [and] to produce a fair trial.' " *Id.*, quoting *City of Lakewood v. Papadelis*, 32 Ohio St.3d 1, 3 (1987).

{¶ 44} In *Lathan*, the defendant filed a notice of self-defense but failed to include any reference to a rap video in which the victim had threatened him. The trial court held, as a sanction under Crim.R. 16, that the video itself could not be played at trial. However, the court did let the defendant testify about it. *Id.* at ¶ 59-64. On appeal, the Sixth District found no abuse of discretion in exclusion of the video, stating that the defendant "was apparently aware of the existence of this video for at least 15 months before trial, and it was incumbent on him to locate it in time to make pretrial disclosure of it. His disclosure of it after the State rested was contrary to the purpose of Crim.R. 16, and it violated Crim.R. 12.2." *Id.* at ¶ 74.

{¶ 45} In the case before us, Holden, based on his own testimony, was clearly aware of his claim that the victims allegedly precipitated the violence by striking him with the Patron bottle and by reaching for a firearm. In fact, on the evening of the shooting, at around 6:43 p.m., Holden searched the internet with his phone, using the term "murder in self defense." Tr. at 544-545. Per the State's disclosure of discovery materials, Holden would also have been aware of what materials the State had collected and submitted to BCI for analysis (which did not include the Patron bottle). *See* Receipt of Discovery Packet (May 5, 2023), and Receipt of Discovery Packet (June 1, 2023). In all, the State filed 19

separate discovery receipts showing items that it had disclosed to Holden. These receipts included several hundred items, many of which involved multiple pages.

**{¶ 46}** Despite knowing of the alleged significance of the bottle, Holden filed a Crim.R. 12.2 notice in October 2023 that contained no description. He later filed a very cursory notice in late June 2024. At trial, Holden then ambushed the State after it rested by offering his story about the Patron bottle. He also attempted to cast doubt on the State's investigation because it had failed to test the bottle. As noted, the bottle did not appear relevant (since blood was all over the front area of the car), and the State had no notice that it could potentially be relevant. If the State had known, it could have tested the bottle itself to disprove Holden's claim. It had no chance to do so.

**{¶ 47}** Nonetheless, our review of the evidence indicates that the jury could have reasonably concluded that the State had satisfied its burden of persuasion on the first element of self-defense, i.e., that Holden did not act in self-defense because he was at fault in creating the situation that gave rise to the affray.

**{¶ 48}** The State was required to disprove only one of the elements relating to self-defense. However, based on the matters already discussed, the jury could have also reasonably concluded that the State also carried its burden of persuasion on the second element. "The second element – whether the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape was the use of deadly force – 'requires consideration of the force that was used in relation to the danger the accused believed he was in.' " *State v. Rothermel*, 2014-Ohio-3168,

¶ 14 (2d Dist.), quoting *State v. Bayes*, 2000 WL 1879101, *4 (2d Dist. Dec. 29, 2000). "This is a subjective test concerning whether the degree of force was reasonable as to the accused. . . . 'Nevertheless, whether the circumstances which created that reasonable belief actually existed must be determined objectively.' " *Id.*, quoting *Bayes* at *4. (Other citation omitted.) Here, the jury could have found that the degree of force Holden used was subjectively unreasonable and that the circumstances objectively did not create a reasonable belief on his part that using deadly force was his only means of escape.

{¶ 49} As indicated, Holden's version of events was contradicted by the State's evidence. Holden shot both women from the back, and they died of multiple gunshot wounds. There were two bullet holes in the front and back of the driver's seat headrest and bullet holes in the passenger-side dashboard. Brown, age 38, had wounds to the head, two wounds of her neck, one of which went through her carotid artery and exited through her jawbone, and a wound to her left upper hip or lower back area. Daniels, age 44, had three wounds to her back; one involved the right lung and another involved the left lung. These wounds were immediately life-threatening. Daniels also had a wound to her right thigh. Brown's hands were crossed and resting in her lap; Daniels's left hand was resting on an armrest and her right hand was resting by her right side. She was also wearing a seat belt. Tr. at 267, 270, 273, 277-278, 289, 290, 295-297, 301, 428, 430, 448, and 679, and State's Exs. 53, 54, 56, and 59 (photos of the women at the scene). There were no bullet defects in the second or third seats in the Suburban, and Holden admitted the women did not shoot the gun in the car. *Id.* at 437-438, 446, and 830-831. He was

also outside the vehicle when he fired the shots. Consequently, even if the jury had credited some portions of Holden's story about the events, it could have also concluded that the force used was excessive and that the circumstances objectively had not created a reasonable belief on Holden's part that using deadly force was his only means of escaping the harm. Again, the jury did not have to believe Holden's testimony.

{¶ 50} For these reasons, the jury's finding that Holden did not act in self-defense was not against the manifest weight of the evidence.

## B. Tampering Conviction

{¶ 51} Holden's second manifest weight challenge relates to the charge for tampering with evidence by removing bullet casings. This challenge is based on Holden's claim that the State failed to present direct evidence that he took the casings; instead, the surveillance video only showed someone reaching into the Suburban to retrieve something.

{¶ 52} The law is well established that " '[c]ircumstantial evidence and direct evidence inherently possess the same probative value . . . .' " *State v. Martin*, 2017-Ohio-7556, ¶ 112, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph one of the syllabus. As a result, the State did not have to provide direct evidence that Holden removed the bullets. Here, abundant circumstantial evidence supported Holden's conviction for tampering with the casings. Specifically, the police were able to obtain about four hours of video surveillance from the Shell station. Tr. at 231-232. The video indicated that no one had accessed the car between the time of the shootings and when

Holden returned to the scene more than two hours later. Furthermore, the gas station attendant testified that he saw Holden trying to search for something and trying to grab something out of the car before D.A. and D.O. arrived. The attendant told Holden not to take anything out of the car because he was going to contact the police. *Id.* at 329. The attendant then ran into the store. When he returned, he again saw people trying to take something out of the car. *Id.* at 332.

{¶ 53} Importantly, the surveillance videos from the church and Shell station showed Holden returning to the station on foot before D.O. and D.A. arrived. First, Holden opened the Suburban's driver's side door. He then opened the rear door on the driver's side and bent over into the interior of the vehicle. Holden moved around inside the vehicle for about 30 seconds before the attendant came outside and approached the vehicle. *See* State's Ex. 44A.

{¶ 54} Holden then closed the rear door and again opened the driver's side door. At that point, Holden was inside the driver's door for about 15 seconds before the attendant rounded the car and came up to the door. *Id.* Subsequently, Holden closed the front door. Then, after D.O. arrived and got out of D.A.'s car, both front doors of the Suburban were opened. At one point during this latter process, Holden was by himself at the front passenger side door, bending inside. He later also went around again to the driver's side of the vehicle and bent over. Holden and D.O. then left the gas station in D.A.'s car. *Id.* All this was visible in the video.

{¶ 55} Holden had ample opportunity to retrieve the casings, and the video evidence established that at least seven bullet casings should have been present. However, the police only found three. Holden was the only individual with a reason to remove the casings, and the circumstantial evidence established that he had the ability to do so. Accordingly, his conviction for tampering with evidence by removing the casings was not against the manifest weight of the evidence.

{¶ 56} Based on the preceding discussion, the first assignment of error is overruled.

### III. Effective Assistance of Counsel

{¶ 57} Holden's second assignment of error states that:

> Trial Counsel's Failure to Cross Examine Several Witnesses and
> Argue a Crim.R. 29 Motion Separately and Collectively Denied Holden His
> Right to Effective Assistance of Counsel.

{¶ 58} Under this assignment of error, Holden contends he was deprived of effective assistance of counsel due to his attorney's failure to cross-examine several witnesses. Holden further contends he was prejudiced by counsel's failure to move for acquittal when the State rested its case. After outlining the applicable law, we will discuss these matters separately.

### A. Applicable Law

{¶ 59} "The right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the 'ample opportunity to meet the case of the prosecution' to which they are entitled." *Strickland v. Washington*, 466 U.S. 668, 685 (1984), quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 275 (1942). "A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691.

{¶ 60} In *Strickland*, the court also stressed that "[j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to

evaluate the conduct from counsel's perspective at the time. . . . Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Id.* at 689, quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955). *Accord State v. Mason*, 82 Ohio St.3d 144, 157-158 (1998).

{¶ 61} Furthermore, "[a]n appellant is not deprived of effective assistance of counsel when counsel chooses, for strategic reasons, not to pursue every possible trial tactic." *State v. Conley*, 2015-Ohio-2553, ¶ 56 (2d Dist.), citing *State v. Brown*, 38 Ohio St.3d 305, 319 (1988). For example, "[f]ailing to question witnesses on cross examination and choosing not to present witnesses fall within the realm of trial strategy." *In re Riley*, 2003-Ohio-4109, ¶ 21 (4th Dist.).

## B. Cross-Examination

{¶ 62} In arguing that trial counsel was prejudicially ineffective, Holden points specifically to three witnesses: A.R. (a friend of Holden and the decedents); Officer Denlinger; and an investigator, Kerry Smoot. We will consider each named witness.

### 1. A.R.

{¶ 63} A.R. testified briefly at trial. She had had a close relationship with both of the deceased women: Brown was her daughter's aunt, and Daniels was dating her

daughter's uncle. A.R. knew Holden through Brown and had occasionally socialized with Holden and the two women. At trial, A.R. testified that she had obtained Holden's phone number from someone and had reached out to let him know about the deaths. She further stated that Holden did not respond right away, and when they did exchange messages, he did not give her any indication that he knew how the women had died. Tr. at 401-405. Defense counsel did not cross-examine this witness, and Holden contends it made him look like "an uncaring and insensitive man with something to hide despite admitting to the shooting – albeit in self-defense." Appellant's brief, p. 12.

{¶ 64} In failing to cross-examine this close friend of two women who had been shot and killed, counsel was likely attempting to limit additional damage to the jury's perception of Holden. A.R. did not testify about either the content of her communications with Holden or how long he took to reply.

{¶ 65} In this vein, A.R. called Holden at 11:16 a.m. on February 26, but he did not answer. She then texted him a few seconds later and asked him to call her as soon as possible. When Holden failed to do so, A.R. texted him again at 11:36 that evening to tell him that Brown and Daniels had been "shot dead" the previous night. She also asked Holden to let her know if he was okay. He still did not respond. Consequently, on February 27, 2023, at around 4:44 p.m., A.R. again texted Holden, saying, "Yo??" *See* State's Ex. 96D. Holden then replied about a half hour later, saying, "Hey [A.R.]. I been so f. . . .ed up. I heard but been in disbelief. My f . . . n head hurt." *Id.* A few moments later, A.R.

responded, "Me too. . ." Holden's response a few seconds later was to say, "I really need a hug yo." *Id.*

{¶ 66} As a further point, Holden had already lied to his close childhood friends, claiming he did not know anything. There is no indication that he admitted shooting the women until he filed a self-defense notice in October 2023, several months after his arrest. Therefore, contrary to Holden's implication in his brief, when he sent these messages, and for a long time after, Holden did not admit he had killed anyone. Accordingly, trial counsel did not act ineffectively in failing to cross-examine A.R.

## 2. Officer Denlinger

{¶ 67} Officer Denlinger also testified briefly. His sole involvement was to meet Detective Woody at Athens Avenue on February 28, 2023. At that time, Denlinger collected Holden's cell phone and lightening cord and gave them to Woody. He also testified that he did not recall seeing any visible injuries to Holden that day. Tr. at 411-413. According to Holden, failing to cross-examine Denlinger was prejudicial because the officer's, testimony, which directly contradicted Holden's testimony, was unchallenged. Appellant's Brief at p. 12.

{¶ 68} As a preliminary point, Denlinger said that he did not "recall" seeing any injuries. In that situation, additional examination might have backfired, resulting in a more definite answer. Not pressing further was a reasonable trial strategy. In addition, Denlinger's testimony was cumulative to that of Det. Woody, who stated unequivocally

that Holden had no visible injuries when she saw him at his house and at the Safety Building. The video taken at the Safety Building (which defense counsel had received in discovery) also did not show any visible injuries. Accordingly, trial counsel did not act ineffectively in failing to cross-examine Denlinger.

### 3. Kerry Smoot

{¶ 69} At the time of trial, Smoot was the chief investigator for the Montgomery County Prosecutor's Office. In this capacity, he handled financial crimes along with digital forensics, including performing analysis and extraction of cell phone data. Tr. at 528 and 530. Smoot had analyzed the data extracted from Holden's phone and testified about it, including internet searches Holden made after the shootings. *Id.* at 530-531, 541-546, and 552; State's Exs. 96A and 96D. On the day of the shooting, Holden's searches included, among other things, sites and items like: "Dayton Daily"; WHIO.com (and an article about the shootings); "Tamper with evidence"; "Murder in Ohio"; "Murder in self defense"; "How far is Mexico from Ohio"; and "Thou shall not kill." *Id.*

{¶ 70} Holden's counsel did not cross-examine Smoot. According to Holden, failing to cross-examine Smoot on searches like murder and travel to Mexico allowed the jury to infer that Holden made the searches because he was guilty. Again, we disagree. Holden conducted these searches, and the jury was allowed to draw its own conclusions. More importantly, cross-examining Smoot would have served no purpose. Smoot was not interpreting data or expressing opinions; he was simply describing content found on the

cell phone. There was no dispute that this content was found on the phone, and as a matter of trial strategy, trial counsel might have decided not to focus more attention on it. Consequently, trial counsel did not act ineffectively in this regard.

### C. Crim.R. 29 Motion

{¶ 71} Holden's second argument is that trial counsel acted ineffectively and prejudiced him by failing to move for acquittal under Crim.R. 29. In this regard, Holden contends that at the end of the State's case, there was only circumstantial evidence of his guilt, leaving the case subject to a sufficiency attack. Holden further argues that making such a motion would have been even more effective at the end of his own case, because his testimony was the only evidence about what happened in the car. Holden's arguments are unpersuasive.

{¶ 72} Under Crim.R.29(A), "[t]he court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses." "In reviewing a record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Tenace*, 2006-Ohio-2417, ¶ 37, quoting *Jenks*, 61 Ohio St.3d 259, at paragraph two of the syllabus.

**{¶ 73}** We have already stressed that both circumstantial and direct evidence have the same probative value. Therefore, even if the State's case were completely "circumstantial," it would have been sufficient, if the proof satisfied the elements of the charged crimes.

**{¶ 74}** In the case before us, the State presented both circumstantial and direct evidence implicating Holden and casting doubt on his self-defense claim. The evidence was also substantial and probative, including: surveillance videos; DNA evidence; forensic evidence related to the location of the cell phones the night of the shootings; the content of Holden's cell phone; the testimony of D.O., who was with Holden when he returned to the gas station after the shootings; and the gas station attendant's identification of Holden through a photo spread a few days after the crime.

**{¶ 75}** Much of this evidence was direct, but some was circumstantial. *See, e.g., State v. Bias*, 2022-Ohio-4643, ¶ 37 (10th Dist.) (photo array identification is direct evidence); *State v. Rodgers*, 2023-Ohio-734, ¶ 87 (2d Dist.) (eyewitness testimony and DNA evidence are direct evidence; cell phone location data and Facebook Messenger communications are circumstantial); *State v. Gillman*, 2008-Ohio-2606, ¶ 18 (3d Dist.) (video clips from store's surveillance cameras are direct evidence); *State v. Watters*, 2016-Ohio-8083, ¶ 86 (2d Dist.) (Welbaum, J., concurring) (surveillance videos are direct evidence).

**{¶ 76}** As Holden concedes, failing to move for acquittal under Crim.R. 29(A) "does not rise to the level of ineffective assistance of counsel if the motion would have been

futile." *State v. Kuck*, 2016-Ohio-8512, ¶ 75 (2d Dist.), citing *State v. Faulkner*, 1993 WL 125452 (2d Dist. Apr. 22, 1993). Here, a motion for acquittal would have been futile because the evidence, construed in the State's favor, was more than sufficient.

{¶ 77} Normally, as noted earlier, if self-defense is at issue, sufficiency is not relevant, since the State has the burden of persuasion. Sufficiency could possibly have come into play if Holden had decided not to assert self-defense. In that situation, the State would have been required to prove its case as it normally does. However, Holden chose to assert self-defense and to testify. Therefore, Holden necessarily admitted he had shot and killed the victims. His burden was to produce sufficient evidence of self-defense (not a high burden), and the review of the State's evidence would then be for manifest weight. As we have already said, the convictions are not against the manifest weight of the evidence. Consequently, trial counsel did not act ineffectively in failing to move for acquittal under Crim.R. 29. Accordingly, the second assignment of error is overruled.

IV. Right of Allocution

{¶ 78} Holden's third assignment of error states that:

The Trial Court Violated Holden's Right of Allocution by Failing to Allow Him or His Trial Counsel to Respond to the Victim Impact Statements

{¶ 79} Under this assignment of error, Holden contends the trial court erred and violated his right of allocution by refusing to let him or his attorney respond to victim impact statements.

**{¶ 80}** The right of allocution is not constitutionally derived but existed at common law. *Green v. United States*, 365 U.S. 301, 304 (1961); *Hill v. United States*, 368 U.S. 424, 428 (1962). In Ohio, the right is embodied in Crim.R. 32(A), which states: "At the time of imposing sentence, the court shall do all of the following: (1) Afford counsel an opportunity to speak on behalf of the defendant and address the defendant personally and ask if he or she wishes to make a statement in his or her own behalf or present any information in mitigation of punishment." "Trial courts must painstakingly adhere to Crim.R. 32, guaranteeing the right of allocution. A Crim.R. 32 inquiry is much more than an empty ritual: it represents a defendant's last opportunity to plead his case or express remorse." *State v. Roberts*, 2013-Ohio-4580, ¶ 66, quoting *State v. Green*, 90 Ohio St.3d 352, 359-360 (2000),

**{¶ 81}** During the sentencing hearing, the trial court noted that it had received victim impact statements from friends and family of the victims and had reviewed and considered all of them. Tr. at 940. The court then specifically addressed allocution and gave both Holden and his attorney the opportunity to speak. *Id.* at 940-941. With specific reference to Holden, the following exchange occurred:

THE COURT: All right. Thank you, Counsel.

And Mr. Holden, this is your opportunity to make any statement that you would like or provide any information in mitigation of punishment before the Court imposes sentence on you. Is there anything that you want to say?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay. You may proceed, sir.

THE DEFENDANT: I want to say first off, I'm sorry -- I'm sorry to the victim's families for the pain that I've caused toward them emotionally, physically, and mentally.

I also want to state that this is not something that I will ever want anybody to go through. I was put in a position where I had to do what I had to do to preserve my life. And I just wanted to say to you, Your Honor, thank you for allowing me to speak these words.

THE COURT: Thank you, sir. You may be seated.

Tr. at 941.

{¶ 82} The rule does not require that allocation occur at a particular time, and the trial court complied with the rule. However, Holden argues the court violated R.C. 2930.14 by failing to let him further speak after two victims spoke. These individuals were Daniels's daughter and father. *Id.* at 942-944. Following their remarks, the court imposed sentence.

{¶ 83} R.C. 2930.14 provides in relevant part that:

(A) Before imposing sentence upon . . . a defendant . . . for the commission of a criminal offense or delinquent act, the court shall permit the victim and victim's representative, if applicable, to be heard orally, in writing, or both during the sentencing or disposition proceeding. The court may give copies of any written statement made by a victim or victim's representative to the defendant . . . and defendant's . . . counsel and may

give any written statement made by the defendant . . . to the victim, victim's representative, or victim's attorney, if applicable, and the prosecutor. . . . The victim's or victim's representative's oral statement is not subject to cross-examination. . . .

(B) The court shall consider a statement made by a victim or victim's representative under division (A) of this section along with other factors that the court is required to consider in imposing sentence . . . . If the statement includes new material facts, the court shall not rely on the new material facts unless it continues the sentencing . . . or takes other appropriate action to allow the defendant . . . an adequate opportunity to respond to the new material facts.

{¶ 84} As a preliminary point, Holden did not object in the trial court. We therefore review this issue only for plain error. *State v. Vanculin*, 2012-Ohio-292, ¶15 (2d Dist.). "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus. No such circumstances exist here.

{¶ 85} "A defendant does not have the right to respond to a victim's statement unless the statement includes new material facts and the court relies on those facts." *State v. Shackleford*, 2011-Ohio-4722, ¶ 25 (2d Dist.). There is no indication that the victim-impact statements contained new material information. Instead, the victims spoke

of their sorrow over the loss and asked that Holden receive the punishment he deserved. Tr. at 942-944.

{¶ 86} As an example of a new material fact, a victim (a defendant's former wife) included in her victim impact statement the new assertion that she was entitled in restitution to the full amount of an insurance check her husband had forged. *State v. Tate*, 2013-Ohio-5167, ¶ 58 (2d Dist.). The parties had been in an auto accident together and had sued a drunk driver. However, the wife left and filed for divorce before a settlement in that action was finalized. The settlement terms included that payment was to be distributed in two checks payable to both parties. After the wife received one check, which was small, the parties met at a bank, where they both signed and cashed the check. At the time, the wife was not aware her husband had already received the much larger check and had deposited it in an account to which she did not have access. Her intent was to meet when the larger check was received and sign it together as they had with the small check. *Id.* at ¶ 6-18.

{¶ 87} The husband continued to lie about the check, and when the wife ultimately found out, she filed police reports that resulted in his indictment on one count of forgery. *Id.* at ¶ 19. After the jury found the husband guilty, the court set the case for sentencing. However, because the wife lived in another state, she recorded a victim impact statement in which she claimed for the first time that she was entitled to the full amount of the larger check. Most of her reasons were not relevant to the merits (as they were both payees),

but the wife did claim her husband had said she was entitled to the full amount. This was inconsistent with the husband's trial testimony. *Id.* at ¶ 19-20 and 58.

**{¶ 88}** On appeal, the husband alleged error under R.C. 2930.14 due to the addition of this new material information. We agreed the information was new and material and that the trial court had considered it in sentencing. However, because of circumstances surrounding the sentencing, we also found the husband had not been deprived of an opportunity to respond; instead, he had chosen not to listen to the videotaped statement and to remain silent. Therefore, we rejected his claim. *Id.*at ¶ 58-59.

**{¶ 89}** The victim impact statements in Holden's case did not contain new material information. Moreover, the trial court did not indicate it had considered these statements.

**{¶ 90}** As a general matter, a " 'trial court has full discretion to impose any sentence within the authorized statutory range, and the court is not required to make any findings or give its reasons for imposing maximum or more than minimum sentences.' " *State v. Worthen*, 2021-Ohio-2788, ¶ 9 (2d Dist.), quoting *State v. King*, 2013-Ohio-2021, ¶ 45 (2d Dist.). While the court was not required to make findings, it did state here that:

> The Court notes that these offenses were cold blooded executions, heinous in nature, devastating to the friends and families of the women that were killed. They were shot from behind, it's hard to imagine a more cowardly act. The audacity to claim, Mr. Holden, that you are the victim in this situation is jaw dropping. Your self-defense claim was, in my estimation,

bogus and preposterous and added an additional insult to the tragedy and the harm that you have caused to these family members and this community.

Tr. at 949-950.

{¶ 91} Notably, the court presided over the trial, which lasted several days, and heard all the evidence. As indicated previously, Holden's version of the events leading to the shootings was contradicted by substantial evidence: there were no phone calls that could have caused the decedents to become agitated and attack him, and Holden also had no signs of injury. Furthermore, given Holden's comments at sentencing, it is hard to imagine what he could have said to redeem himself even if the victim impact statements had contained new material facts (which they did not). There was no plain error or even any error. Accordingly, the third assignment of error is overruled.

## V. Restitution

{¶ 92} Holden's fourth assignment of error states as follows:

The Trial Court Erred When It Failed to Find that Holden Had the Ability to Pay Before Imposing an Order of Restitution.

{¶ 93} Under this assignment of error, Holden maintains that the trial court erred in failing to consider his ability to pay restitution. As indicated earlier, the court required Holden to pay both decedents' funeral expenses.

{¶ 94} R.C. 2929.18(A) provides that a "court imposing a sentence upon an offender for a felony may sentence the offender to any financial sanction or combination of financial sanctions authorized under" that section, and "shall sentence the offender to make restitution pursuant to" R.C. 2929.18 and R.C. 2929.281. In deciding the amount of restitution, "the court shall order full restitution for any expenses related to a victim's economic loss due to the criminal offense." R.C. 2929.281(A). Furthermore, before the court imposes a financial sanction under R.C. 2929.18, it "shall consider the offender's present and future ability to pay the amount of the sanction or fine." R.C. 2929.19(B)(5).

{¶ 95} Here, the State addressed restitution in its sentencing memorandum (referencing the amount of funeral expenses), but Holden did not discuss this point in his own sentencing memorandum. *See* State's Sentencing Memorandum (Aug. 14, 2024), p. 8; Motion to Merge Convictions for the Purposes of Sentencing (Aug. 20, 2024), p. 2-6. Holden also failed to object during the sentencing hearing. Tr. at 940-950.

{¶ 96} When a party fails to object in the trial court, our review is for plain error. "A defendant who does not dispute an amount of restitution, request a hearing, or otherwise object waives all but plain error in regards to the order of restitution." *State v. Parks*, 2024-Ohio-5026, ¶ 72 (2d Dist.), quoting *State v. Snowden*, 2019-Ohio-3006, ¶ 88 (2d Dist.). "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Long*, 53 Ohio St.2d 91, at paragraph three of the syllabus.

{¶ 97} To prevail under the plain error doctrine, a defendant must show "an error, i.e., a deviation from a legal rule," and "the error must be plain," that is, "an 'obvious' defect in the trial proceedings." (Citations omitted.) *Barnes*, 94 Ohio St.3d at 27. However, "even if the error is obvious, it must have affected substantial rights," meaning the defendant "is therefore required to demonstrate a reasonable *probability* that the error resulted in prejudice – the same deferential standard for reviewing ineffective assistance of counsel claims." (Emphasis in original.) *State v. Rogers*, 2015-Ohio- 2459, ¶ 22, citing *United States v. Dominguez Benitez*, 542 U.S. 74, 81-83 (2004).

{¶ 98} During the sentencing hearing, the court imposed restitution of $3,743.90 payable to the Ohio Victims of Crime Compensation Fund for Daniels's funeral expenses, and $5,320.95, payable to the same fund for Brown's funeral expenses. Tr. at 945-946. The court did not specifically state on the record that it had considered Holden's ability to pay. However, it did say during the hearing that it had received and considered "a short form of a pre-sentence investigation, a report that included restitution information as well as victim impact information," and had also reviewed the parties' sentencing memoranda. *Id*. at 940. The court further remarked that, given the 45-year definite year term before Holden would be eligible for parole, he would very possibly be in prison for the remainder of his natural life. *Id*. at 951. This was correct. Since Holden was 34 years old at sentencing, he would be nearly 78 years old at his expected release date in 2068. *See* Ohio Department of Rehabilitation and Correction Notice of Commitment and Calculation

of Release Date (Sept. 24, 2024). We note that the amount of restitution divided by 45 amounts to around $201 per year.

{¶ 99} R.C. 2929.19(B)(5) does not identify any specific factors; it only requires courts to "consider" an offender's present and future ability to pay. *State v. T.O.*, 2025-Ohio-15, ¶ 13 (2d Dist.), citing *State v. Philbeck*, 2015-Ohio-3375, ¶ 27 (2d Dist.). "Although preferable, the trial court is not required to state on the record that it considered an offender's present and future ability to pay so long as there is evidence in the record from which a reviewing court can infer that the trial court considered the offender's present and future ability to pay prior to imposing restitution." *Id.*, citing *State v. Hull*, 2017-Ohio-7934, ¶ 9-10 (2d Dist.).

{¶ 100} Our review reveals no plain error, as evidence in the record allows us to infer that the court considered Holden's ability to pay. Specifically, Holden testified at trial about his employment history after graduating from high school. This history included: two years as a teacher's assistant at an elementary school where his mother worked; nine or ten years at a mental health facility called Access Hospital; about a year-and-a-half at Sycamore House or Hospital on the wound care floor; and two-and-a-half years as an operator at a Cargill plant in Dayton. Tr. at 783-795 and 787. At a minimum, that represented 15 years of employment. Holden was born in July 1990. Assuming that he graduated from high school at age 18, his stated employment history would have taken him to around age 33, which actually would have been shortly after his arrest in February 2023.

**{¶ 101}** According to Holden's testimony, he was unemployed at the time of the incident. However, he said he had sued Cargill for racial discrimination, had received a settlement, and intended to start his own business. Holden had also testified that he had $10,000 in cash with him on the night of the murders; the parties intended to go to a casino because Holden wanted to spend part of his settlement money and have fun. He further said that he had received $70,000, then had another posting, and was still being paid every Friday, Thus, over that period of time, he had received $120,000 in settlement funds. Presumably, if Holden were still receiving payment as he said, more money would accrue. Holden's arrest occurred only two days after the murders, and the trial court could have concluded that he had sufficient remaining funds from his settlement to pay restitution. *Id.* at 713, 787-788, 795, and 798-799.

**{¶ 102}** Based on the preceding discussion, this case does not involve exceptional circumstances that would warrant setting the restitution order aside in order to prevent a manifest miscarriage of justice. Accordingly, the fourth assignment of error is overruled.


VI. Conclusion

**{¶ 103}** All of Holden's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . .

EPLEY, P.J. and LEWIS, J., concur.